Argued and submitted August 27, 1999, reversed and remanded
November 22, 2000

### STATE OF OREGON,
*Appellant,*

*v.*

### MICHAEL EDWARD BLAIR,
*Respondent.*

(97-1737; CA A102546 (Control))

### STATE OF OREGON,
*Appellant,*

*v.*

### DALE HOWARD VANIS,
*Respondent.*

(97-1738; CA A102547)
(Cases Consolidated)

14 P3d 660

Jennifer S. Lloyd, Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Robin A. Jones, Deputy Public Defender, argued the cause for respondent Dale Howard Vanis. With her on the brief was David E. Groom, Public Defender.

No appearance for respondent Michael Edward Blair.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

LINDER, J.

### LINDER, J.

Defendants were charged with the manufacture and possession of a controlled substance. ORS 475.992(1)(a) and (4)(a). Before trial, they successfully moved to suppress evidence obtained in a warrantless search of their van, together with statements that they made to the arresting officers. The state appeals, and we reverse and remand.

■ ■ We review the trial court's legal conclusions for errors of law. *State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). Because the trial court did not make specific findings of historical fact, we presume that the court decided the facts consistently with its ultimate conclusion. *Id*. We summarize the facts based on the testimony of the two officers who testified at the suppression hearing.[1]

Late at night, Deputies Erichsen and Conroy were on patrol responding to an unrelated call when they noticed a van on the side of a two-lane highway. Traffic at the time was heavy, with a steady flow of vehicles passing by the van. The van was "straddling the white fog line," its hazard lights were flashing, and it was either parked on the side of the road or was slowly rolling forward.[2] There was no lighting in the area. Because the van appeared to need assistance, the officers pulled up behind it and turned on their spotlight both to illuminate the area and for officer safety. Officer Erichsen also activated the patrol car's overhead flashing emergency lights to make sure that passing traffic could see them. He then informed dispatch that they were stopping to respond to a "motorist assist." After the officers stopped behind the van, the van either continued or began rolling slowly forward for a short distance and then came to a complete stop. Defendant Blair, the driver of the van, got out and rushed toward the patrol car. Erichsen asked Blair if he was having vehicle problems and informed him that, because he was parked partially in the roadway, he easily could cause a collision with passing traffic. Blair replied that nothing was wrong with the van and that they were just sitting there. While he talked to

---

[1] Neither defendant testified.

[2] The officers' memories on this point differed. We discuss the significance of this factual discrepancy later in our analysis.

the officers, Blair was visibly shaking and nervous, he kept looking back at the van, and he kept trying to block the officers' view.

Meanwhile, both officers observed movement inside the van. Conroy approached the van, looked through the rear window with the aid of a flashlight, and saw marijuana plants in the cargo area.[3] After advising Erichsen of the marijuana, Conroy told Blair to put his hands on the patrol car. At that point, defendant Vanis, a passenger, got out of the van and walked toward the patrol car. The officers eventually searched the van, discovered several marijuana plants and evidence relating to marijuana cultivation, and arrested defendants. During the course of those events, both defendants made incriminating statements.

Before trial, relying on both statutory and constitutional grounds,[4] defendants moved to suppress the evidence obtained in the warrantless search of the van and the statements that defendants made to the arresting officers. Specifically, they contended that the officers unlawfully stopped and detained them without reasonable suspicion that a crime had been committed. Defendants urged that, because they were "stopped," once the officers realized that they did not need assistance, the officers were obligated to cease their investigation and allow defendants to leave.

At the pretrial hearing on defendants' motions, the state first argued that the officers' conduct in attempting to render assistance to a motorist was not a "stop" for constitutional purposes. Thus, the officers were not under any obligation to cease their investigation when they learned that defendants did not need motorist assistance. Alternatively, the state argued that, even if defendants were stopped, the officers had probable cause to stop them for illegal parking, which would be a traffic infraction under ORS 811.550 and

---

[3] The officers' testimony about the distance between the patrol car and the van at that time was inconsistent. Erichsen testified that the van was parked approximately 100 feet in front of the patrol car; Conroy guessed that it was parked about eight feet in front of the patrol car. The distinction appears not to have been significant to the trial court's analysis, nor is it to ours.

[4] Defendants cited ORS 131.605 to ORS 131.615, Article I, section 9, of the Oregon Constitution, and the Fourth Amendment to the United States Constitution.

ORS 811.555, and the officers did not exceed the permissible scope of investigating that infraction.

The trial court granted defendants' motions, concluding that, by any reasonable and objective standard, the actions of the officers amounted to a stop of defendants' vehicle. The trial court further reasoned that, once defendant Blair indicated that he did not need motorist assistance, the inquiry should have ended because "the reason for the stop had dissipated." In the trial court's view, the stop became unlawful at that point and therefore "the further search or viewing inside the van was a[n] unlawful search and the evidence will be suppressed with regard to the plants which were seized and the statements taken from [defendants] following the arrest because that was the fruits of the unlawful search."

On appeal, the parties largely renew the arguments that they made below.[5] Because we agree with the state's argument that the encounter did not amount to a stop, we do not reach its alternative argument that, even if the encounter was a stop, it was lawfully based on defendants' commission of a traffic infraction.

The threshold issue for our resolution is whether the officers "seized" defendants within the meaning of Article I, section 9, of the Oregon Constitution.[6] The applicable test has both subjective and objective components:

"[A] 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution (a) if a law enforcement officer

---

[5] In support of their motions to suppress, defendants also argued that, even if the officers' conduct was in all other respects lawful, use of the flashlight to illuminate the interior of the van was a technological enhancement that unconstitutionally invaded defendants' privacy. The trial court did not reach that issue. On appeal, anticipating a possible alternative right-for-the-wrong-reason argument by defendants, the state defends the constitutionality of the flashlight's use. Defendants, however, have declined to make that argument on appeal, thus waiving it. The issue therefore is not before us.

[6] As earlier noted, defendants relied on statutory grounds, as well as state and federal constitutional provisions, all of which protect citizens against "unreasonable" seizures. Although ordinarily we consider statutory arguments before constitutional ones, here the analysis of the statutory requirements is the same because the statutes codify constitutional requirements. See State v. Toevs, 327 Or 525, 534, 964 P2d 1007 (1998) (citing State v. Kennedy, 290 Or 493, 496-97, 624 P2d 99 (1981)). We therefore begin with the analysis under Article I, section 9.

intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

*State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991). *See also State v. Juarez-Godinez*, 326 Or 1, 6-7, 942 P2d 772 (1997). As that test suggests, not all encounters between citizens and police officers are seizures in the constitutional sense. Rather, those encounters potentially fall into one of three general categories: (1) a "mere conversation," which involves no restraint of the citizen and requires no justification; (2) a "stop," which is a temporary restraint that must be justified by reasonable suspicion that the citizen is involved in criminal activity; and (3) an "arrest," which must be justified by probable cause. *Holmes*, 311 Or at 407. Of those categories, only arrests and stops qualify as seizures under Article I, section 9. In any given case, determining which of those three categories a particular police-citizen encounter fits requires "a fact-specific inquiry into the totality of the circumstances." *Id.* at 408.

In analyzing whether this police-citizen encounter constituted a "stop," the parties' arguments proceed from different factual starting points. The state asserts that the van "was already stopped when the deputies noticed it" and then it began moving—albeit only a short distance—after the officers had turned on their overhead flashing lights and had illuminated the area with their spotlight. The state emphasizes that the officers did nothing additional when the van began rolling forward to "in any way indicate to the driver of the van that it could not continue to drive off" and that, instead, defendants stopped the van of their own accord after rolling forward about 100 feet. The state thus cites and places particular reliance on cases in which we have concluded that, when an officer approached a citizen and asked questions, the officer's conduct was not a "stop" because either the citizen was already stopped of his or her own volition when the officers approached, or the citizen stopped without any signal or show of authority requiring him or her to do so. *See, e.g., State v. Fields*, 122 Or App 38, 41-42, 857 P2d 179 (1993) (no

stop when a motorist defendant was already parked on shoulder of road and the officer merely engaged defendant in conversation after approaching him); *State v. Miller,* 120 Or App 349, 852 P2d 895 (1993) (no stop when the officer came upon a motorist who had already stopped of her own volition, asked her questions and, as she walked away, activated his vehicle's lights and called out to her).

Defendants, in contrast, insist that, viewed in a light most favorable to the trial court's ruling, the record establishes that the van was moving when the officers first saw it and that it continued moving after the officers activated their lights. Necessarily, then, according to defendants, the officers had activated their overhead lights before the van came to a complete stop and defendants objectively could not have believed that they were free to drive away because to do so would be a crime. *See* ORS 811.540 (fleeing or attempting to elude a police officer). Defendants are correct in describing how we must view the factual record. Consequently, we must analyze this case with the understanding that the van was rolling slowly forward when the officers first noticed it and that it came to a complete stop at some point shortly after the officers had pulled behind the van, had activated their overhead lights, and had illuminated both the van and the general area with a spotlight. We do not agree, however, that such a view of the factual circumstances is dispositive.

In that regard, the Supreme Court's decisions in *Holmes* and *State v. Gerrish,* 311 Or 506, 815 P2d 1244 (1991), merit extended discussion because they establish that an officer's signal or command to a citizen to "stop" physically does not automatically transform the police-citizen encounter into a "stop" — and, hence, a seizure — in the constitutional sense. In *Holmes,* an officer had positioned himself and his vehicle, with its overhead lights flashing, about one-half mile from a car accident in order to stop approaching motorists and advise them of a detour around the accident. The emergency vehicles attending the accident were visible in the distance. Upon stopping and approaching the defendant-driver in that case, the officer observed that the defendant appeared to be intoxicated. After having the defendant perform field sobriety tests, the defendant was arrested.

*Gerrish* involved similar facts. There, an officer parked his patrol vehicle, with its overhead lights activated, at the exit of a resort where a robbery and shooting had recently occurred. He intended to stop every vehicle leaving the area in order to determine if the occupants either were witnesses to the crime or had committed it. The defendant initially drove past the officer, but he stopped when the officer commanded him to do so. As in *Holmes*, based on the officer's observations of the defendant-driver, the defendant was arrested for driving under the influence of intoxicants.

■ Significantly, in both cases, the Supreme Court rejected the proposition that whenever an officer physically stops a citizen or otherwise interferes with a citizen's freedom of movement, the officer has "seized" the citizen for constitutional purposes. The court explained:

> "[L]aw enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9 'seizure' merely because the encounter may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.,* policeman tapping citizen on the shoulder at the outset to get a citizen's attention). *See* LaFave, 3 Search and Seizure, A Treatise on the Fourth Amendment 413, § 9.2(h) (2d ed 1987)."

*Holmes,* 311 Or at 410. *Accord Gerrish,* 311 Or at 513. The court made clear that the touchstone is not whether an officer has restrained a citizen's freedom of movement to any or some degree, but whether the interference or restraint is significantly out of the ordinary:

> "[T]he encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that

would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

*Holmes*, 311 Or at 410.

The court's application of that general principle to the particular facts in *Holmes* and *Gerrish* provides further insight into the analysis. In *Holmes*, the court determined that the encounter was a constitutionally insignificant intrusion because motorists frequently witness officers directing and stopping traffic in connection with accidents and such encounters are not objectively intimidating. Indeed, the court observed that, from an objective standpoint, a "reasonable motorist would appreciate" the officer's effort. *Id*. at 411. In *Gerrish*, the court recognized that the situation was somewhat different: The officer there was not stopping motorists to impart information, as in *Holmes*, but instead was seeking to gather information (*i.e.*, to identify witnesses to or possible perpetrators of a crime). That difference did not, however, compel a different conclusion. "[T]he officer's initial actions of flagging defendant down and directing him to stop were the only means available to get defendant's attention long enough to request information" and were "analogous to 'tapping [a] citizen on the shoulder at the outset to get a citizen's attention.'" *Gerrish*, 311 Or at 513. As in *Holmes*, the court held that the officer's interference with the motorist's freedom of movement was not a "seizure," because a reasonable motorist would not view the degree of restriction or interference to be *significant. Id*.

■ The nature of the encounter here is not meaningfully distinguishable from those in *Holmes* and *Gerrish*. When the officers first saw defendants' van, it was rolling slowly forward, late at night, with its hazard lights flashing, straddling the fog line of a busy highway in an unilluminated area. From an objective standpoint, the circumstances reasonably suggested that the van possibly was disabled and, whether it was disabled or not, that it was creating a potential traffic hazard. Indeed, by law, hazard lights on vehicles generally are to be activated only if a vehicle is disabled or if it is parked where other operators need to be warned to use unusual care in approaching, overtaking, or passing it.[7] Thus, defendants'

---

[7] *See* ORS 811.515(13)(a) (use of hazard lights); ORS 815.035 (authorizing rules for roadside vehicle warning devices); OAR 735-114-0010 (federally required

use of the van's hazard lights essentially announced to all other motorists or passersby that their vehicle was disabled or was in a hazardous situation.

Given that announcement, any reasonable motorist in defendants' place would perceive the officers to be stopping behind them for the purpose of inquiring whether something was wrong and perhaps warning them of the safety problem they posed. The officers in fact stopped their vehicle behind the van because of their concern that the van's occupants needed assistance and because the van was "parked" where it could cause a collision.[8] They activated their overhead lights for safety purposes only. As in *Holmes*, motorists frequently witness police or other officials giving roadside aid to motorists stranded by car trouble of one kind or another.[9] Indeed, such aid often is offered by other motorists and by tow vehicles called to the scene. In the case of police vehicles and tow vehicles, their overhead flashing lights often are activated, alerting other drivers to their presence and to the fact that a hazard exists at the roadside. In the case of private motorists, they may shine their vehicle headlights on the area, turn on hazard lights, and make other efforts to warn passing vehicles of their presence (*e.g.*, flares, reflective signs). There is nothing uncommon or psychologically intimidating about such a setting generally, nor was there anything that made it so here. *See Holmes*, 311 Or at 411; *Gerrish*, 311 Or at 513. A reasonable motorist under the circumstances likely would appreciate an officer's concern, even if the motorist in fact was not having car trouble. At worst, as in *Holmes* and *Gerrish*, a reasonable motorist might consider an officer's inquiry somewhat annoying or inconvenient. But in all events, an encounter of this kind, *reasonably* perceived does not significantly intrude on the motorist's freedom of movement.

---

vehicle hazard warning lights to be used to warn approaching traffic of a stopped or disabled vehicle).

[8] The officers believed that the van's position at the side of the road, straddling the fog line, was a violation of the traffic code. They did not, however, contact the driver with the intent to cite him for that violation.

[9] Other official vehicles equipped to alert motorists to their presence with overhead flashing lights include certain fire fighting, airport security, and federal emergency vehicles. *See, e.g.*, ORS 801.260.

■ To be sure, these defendants *subjectively* knew that they had marijuana plants in the van and that they might, because of the officers' inquiry, be caught with them. But in that respect, they were in a position no different from the defendants in *Holmes* and *Gerrish,* who were subjectively aware that they had been drinking alcohol. A defendant's *subjective* guilty awareness is not the test. The test is whether, objectively, a motorist in the position that these defendants were in would view the officers' conduct in stopping behind them, and activating the vehicle's overhead lights, to be a *significant* restriction on the motorist's liberty. Here, a reasonable motorist in this same circumstance would not take that view of the officers' actions.

■ Our conclusion is not altered by that fact that, even though Erichsen activated the patrol vehicle's overhead lights in this instance for safety reasons, a reasonable motorist might not feel free to leave while the lights remained activated. In both *Holmes* and *Gerrish,* not only did the officers activate their vehicles' overhead flashing lights, their conceded *purpose* for doing so was to require passing motorists to come to a brief stop; no reasonable motorist in the circumstances presented in those cases (*i.e.,* where police were attempting to block passage) would assume otherwise. Thus, no reasonable motorist would feel free to leave without potential consequence. *See* ORS 811.540.[10] But, as the Supreme Court's decisions in those cases emphasize, the fact that an officer halts a citizen and restrains the citizen's freedom to leave for a brief period to request or to impart information is not a basis on which the contact becomes a "seizure" for constitutional purposes. A more significant restraint is required. *See generally Miller,* 120 Or App at 351-52 (encounter was not converted into an unconstitutional stop by use of flashing yellow lights); *State v. Dubois,* 75 Or App 394, 398, 706 P2d 588, *rev den* 300 Or 451 (1985) ("[A]n officer's use of overhead

---

[10] ORS 811.540(1) provides that a person operating a motor vehicle commits the crime of fleeing or attempting to elude a police officer if the person knowingly flees or attempts to elude a police officer who "gives a visual or audible signal to bring the vehicle to a stop, including any signal by hand, voice, emergency light or siren * * *." Fleeing in a motor vehicle is a Class C felony; fleeing on foot is a Class A misdemeanor. ORS 811.540(3).

lights alone does not necessarily cause an encounter to be a stop.").

In its ruling, the trial court cited and relied on *State v. Walp,* 65 Or App 781, 672 P2d 374 (1983), as do defendants on appeal. To whatever extent our conclusion that the defendant was "seized" in *Walp* can be understood to turn only on our observation that "[a] reasonable person would not [have felt] free to drive away once the officer turned on the emergency lights," *id.* at 784, that analysis has been superseded by the holdings in *Holmes* and *Gerrish.* Equally important, however, *Walp* is significantly distinguishable on its facts. There, the officers followed the defendant for some distance from the scene of a party to which they were responding. In apparent response to their doing so, the defendant turned onto another road, pulled over onto the shoulder, and stopped. The officers turned on the patrol vehicle's overhead lights, stopped behind the defendant's car, and approached the defendant, detecting alcohol on her breath once they contacted her. No similar facts are involved in this case.[11]

In sum, we hold that defendants were not seized under Article I, section 9, because a reasonable motorist in defendants' circumstances would not have believed that the police stopped behind their vehicle for anything more than "a brief encounter resulting in an insignificant intrusion." *See Holmes,* 311 Or at 411. For like reasons, the encounter was not a seizure under the Fourth Amendment. *See Holmes,* 311 Or at 412-14 (discussing federal seizure analysis); *State v. Puffenbarger,* 166 Or App 426, 433, 998 P2d 788 (2000) (same). Consequently, the officers were free to engage defendants in conversation without having a specific level of suspicion or cause to believe that defendants had committed or were about to commit a crime. The officers also were under no obligation to discontinue their conversation or to invite defendants to leave the scene when they learned that defendants did not need motorist assistance. The trial court therefore erred in suppressing the evidence obtained as a result of

---

[11] Whether our holding in *Walp* would be the same or different in light of the guidance provided in *Holmes* and *Gerrish* is a question we neither should nor do decide in this case.

the encounter and the statements made by defendants as the "fruits" of an unlawful seizure.

Reversed and remanded.