Argued and submitted July 31, 2001, reversed and remanded January 30, 2002

## STATE OF OREGON,
*Appellant,*

*v.*

## COY RANDELL SNOW,
*Respondent.*

99CR0872; A110840

39 P3d 909

Douglas F. Zier, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Ingrid A. MacFarlane, Deputy Public Defender, argued the cause for respondent. With her on the brief was David E. Groom, Public Defender.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

Wollheim, J., dissenting.

## HASELTON, P. J.

The state appeals from a pretrial order suppressing evidence obtained in a warrantless search of an automobile, arguing that the search fell within the "automobile exception" to the warrant requirement or, alternatively, that another exigency justified the search. We conclude that the automobile exception justified the search, and reverse and remand.

The following facts are not disputed. Just before noon on Monday, September 20, 1999, Josephine County Sheriff's Deputy Lucas was traveling northbound on Highland Avenue in Grants Pass. While on routine patrol, Lucas observed defendant in a 1981 black Mercury "laying rubber" while turning from Elm Street southbound onto Highland. Defendant rapidly accelerated past Lucas. Lucas testified that he got a good look at defendant from the neck up as they passed each other and that he did not recognize defendant at that time. Lucas slowed, waited for traffic to clear, radioed dispatch, made a U-turn, activated his overhead lights, and pursued defendant.

While Lucas was pursuing him, defendant turned left onto Prospect Street. Lucas also turned left on Prospect, but he did not see defendant's car. As Lucas approached Kinney Street, a pedestrian was pointing, apparently in the direction of defendant's line of travel. Lucas turned in that direction but was still unable to see the car. After traveling a couple more blocks, another pedestrian pointed toward the apartment complex parking lot where the car was parked and unoccupied. That pedestrian informed Lucas that the Mercury had gone through a stop sign at approximately 30 to 40 miles per hour. From the time Lucas lost sight of the vehicle until he located it in the apartment parking lot, between one and two minutes had elapsed. Lucas parked his patrol car and approached the Mercury on foot. He determined that the hood of the Mercury was still warm and confirmed that it was the same car that he had been pursuing.

By that time, another officer, Lieutenant Anderson, had arrived on the scene. Lucas and Anderson briefly searched on foot for the driver, leaving the car unattended for

only a few moments.[1] As they were searching, a resident of the apartment complex told Lucas that this was the third time that the same person had eluded the police after driving recklessly in this area; however, the resident did not provide the suspect's name. At about the same time, the police dispatcher informed Lucas that a man had been spotted running through a nearby yard and house. Lucas suspected that that man was the same person he was chasing.

Lucas returned to the Mercury and determined that it was unlocked. He then called his dispatcher and learned that the car's registered owner was Debra Atwood. Knowing that the person he had observed driving the car was a male, Lucas decided to search the car for evidence of the driver's identity. During that search, Lucas found a shotgun under some clothing. In addition, Lucas found two pieces of identification in a backpack behind the front seat. Both pieces of identification belonged to defendant, and Lucas recognized the man pictured on the pieces of identification as the same man he had seen driving the Mercury.

Defendant was ultimately arrested and indicted on counts of felon in possession of a weapon, ORS 166.270, and reckless driving, ORS 811.140.[2] Before trial, defendant moved to suppress the evidence that Lucas had found in the car, asserting that the warrantless search of the automobile did not fall within any exceptions to the warrant requirement and, thus, violated his rights under Article I, section 9, of the Oregon Constitution.[3] The state, in response, invoked the "automobile exception," *State v. Brown*, 301 Or 268, 721 P2d 1357 (1986), and argued, further, that other exigent circumstances obviated the need to obtain a warrant. Defendant countered that the automobile exception did not apply both

---

[1] It is unclear from the record exactly how many other officers arrived to assist Lucas. It is possible that as many as three officers arrived; however, the record only indicates that Lucas and Anderson remained at the scene to attempt to locate defendant.

[2] The record is unclear regarding when defendant ultimately was apprehended. However, it is apparent that the arrest did not occur on the same day as the chase.

[3] Article I, section 9, of the Oregon Constitution, provides, in pertinent part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

because there was no probable cause to search the vehicle and because the vehicle was not "mobile" at the time it was searched. Defendant also argued that the search was not justified by any other exigent circumstances.

The trial court granted defendant's motion, concluding that, although there was probable cause for the search, the vehicle was not mobile at the time of the search:

"In the case at bar, [defendant's] vehicle was parked, unoccupied, the engine was off and defendant had been observed running from the scene. While the vehicle was mobile when * * * Lucas first saw it, it was not at the time of the search. Accordingly, the [c]ourt would hold that the automobile exception does not apply in the case at bar."

The trial court also rejected the state's contention that other exigent circumstances justified the search.

On appeal, the state renews its argument that the automobile exception applies. It argues that mobility of the vehicle is determined by reference to the first police encounter with the vehicle—which, in this case, was Lucas's observation of the vehicle accelerating around the corner and down Highland Avenue. The state further argues that other exigent circumstances—namely, the fear that defendant might soon acquire another vehicle and drive it at improvidently high rates of speed, possibly endangering others—justified Lucas's search of the Mercury in his attempt to quickly ascertain defendant's identity. Defendant responds that, although the vehicle was *moving* when first observed by Lucas, it was not *mobile* when Lucas searched, and there were no other exigent circumstances that justified the search.

As described below, we agree with the state that the automobile exception justified the warrantless search of the car.[4] However, in order to fully explain that conclusion, we must first engage in a comprehensive review of the development of the automobile exception under Oregon law. We acknowledge, before embarking on that review, that the

---

[4] Defendant does not cross-assign error to the trial court's conclusion that Lucas had probable cause to search the vehicle. Consequently, as discussed below, the applicability of the automobile exception in this case hinges on whether the Mercury was "mobile at the time of the stop." *Brown*, 301 Or at 277.

exception's development has not necessarily always been internally consistent. *See Brown*, 301 Or at 283-87 (Linde, J., dissenting) ("Cases on warrantless searches and seizures of vehicles * * * involve enough variables to allow almost any precedent to be distinguished in a later case.").

The Supreme Court first recognized the automobile exception in *Brown*. The court held:

> "[P]robable cause to believe that a lawfully stopped auto-mobile which was mobile at the time of the stop contains contraband or crime evidence justifies an immediate war-rantless search of the entire automobile for the object of the search, despite the absence of any additional exigent cir-cumstances." *Brown*, 301 Or at 277.

In so holding, the court expressly reserved the question of the exception's potential applicability to a "search of a vehicle that is not mobile and has not just been lawfully stopped by a police officer." *Id. See also State v. Bennett*, 301 Or 299, 304, 721 P2d 1375 (1986) ("[W]e do not reach the issue of warrant-less searches of unoccupied, parked or immobile vehicles.").

In *State v. Kock*, 302 Or 29, 725 P2d 1285 (1986), the Supreme Court addressed the "unoccupied" or "immobile" vehicle issue reserved in *Brown* and *Bennett*. There, two police officers were conducting surveillance at a store where the defendant worked a graveyard shift. The store manager had informed the officers that the defendant did not have permission to take merchandise from the store. During their surveillance, the officers observed the defendant leave the store and carry a box over to his parked car. The defendant removed a package from the box, placed it inside the car, and then returned to the store with the box. The officers approached the car and observed the package behind the front seat, partially covered by a pair of pants. Without a warrant, the officers opened the door of the car, seized the package, and discovered that it contained diapers stolen from the store. The trial court denied the defendant's motion to suppress and, in the defendant's ensuing appeal of his convic-tion, the state invited the Supreme Court to extend the auto-mobile exception to those circumstances where the vehicle was merely capable of mobility. The court refused:

"[W]e elect to draw the so-called bright line of *Brown* just where we left it in that case: Searches of automobiles that have *just been* lawfully stopped by police may be searched without a warrant and without a demonstration of exigent circumstances when police have probable cause to believe that the automobile contains contraband or crime evidence." *Kock*, 302 Or at 32-33 (emphasis added).

In a series of cases following *Kock*, we declined to apply the automobile exception to unoccupied, parked cars. *State v. Vaughn*, 92 Or App 73, 757 P2d 441 (1987), *rev den* 306 Or 661 (1988), is exemplary. In *Vaughn*, the police, who had received information that the defendant was transporting drugs, followed the defendant's vehicle but did not stop it or attempt to pull it over. Ultimately, the defendant parked at a house, which he entered. The officers watched the residence for approximately 25 minutes before approaching it and ordering all of the occupants, including the defendant, out of the house. The occupants were ordered to lie on the ground, where they were guarded by armed officers. The defendant refused to give the officers permission to search his car, but they searched it anyway and found a large stash of marijuana. We held that the search was not justified by the automobile exception because the vehicle was not mobile: "Although [the] defendant's vehicle was mobile when the police first saw it, it was not when they first confronted [the] defendant." *Vaughn*, 92 Or App at 77.[5]

*State v. Cromwell*, 109 Or App 654, 820 P2d 888 (1991), marked an expansion[6] of the exception. In *Cromwell*,

---

[5] Similarly, in *State v. Crook*, 93 Or App 509, 512, 762 P2d 1062 (1988), we held that, absent exigent circumstances, the warrantless search of an unoccupied car discovered in the middle of an intersection was not justified. In *Crook*, an officer who was investigating a burglary received a report that a vehicle matching the suspect's vehicle was parked nearby in the middle of an intersection. When the officer arrived, there was no one in the car, but the car's hood was warm, and the key was in the ignition. Through an open window, the officer recognized stolen property in the car. Without attempting to obtain a warrant, the officer searched the vehicle and seized documents that identified the defendant. Citing *Kock*, we held that, even in such circumstances, there was no justification for a warrantless search. *Crook*, 93 Or App at 512. *See also State v. Giffen*, 98 Or App 332, 334-35, 778 P2d 1001 (1989) (where police arrested the defendant in her home and seized her car keys, subsequent warrantless search of the defendant's car, which was parked 100 feet from her residence, did not fit within the automobile exception).

[6] Some would say "distortion." *See State v. Burr*, 136 Or App 140, 153, 901 P2d 873, *rev den* 322 Or 360 (1995) (Armstrong, J., dissenting) (asserting that *Cromwell* is irreconcilable with *Kock* and, thus, "should be overruled").

we first endorsed the concept of "constructive mobility." There, when the police first encountered the defendant's pickup, it was parked—with the defendant in the driver's seat—in the middle of the roadway, with its engine off but its parking lights on. After noticing a small amount of marijuana on the seat beside the defendant, the officers conducted a warrantless search of the rest of the vehicle and discovered additional drugs. We held that, although the vehicle was motionless at the time the officers first encountered it, it remained "mobile" because the "defendant could have driven away at any moment. The fact that [he] had not yet turned the key was merely fortuitous." *Id.* at 659.

In *State v. Warner*, 117 Or App 420, 844 P2d 272 (1992), we considered yet another variation and held that an inoperable car—even if occupied—is not mobile. There, a police officer saw the defendant's pickup traveling in the opposite direction at a speed of less than 14 miles per hour. The pickup pulled onto the shoulder and stopped, and the defendant got out and opened the hood. The officer pulled up behind the pickup, got out, and asked the defendant if he needed assistance. The defendant did not respond; instead, he lowered the hood, got into the pickup, and several times attempted unsuccessfully to start it. At that point, the officer smelled the odor of narcotics coming from inside the vehicle and proceeded to search the vehicle without a warrant, discovering evidence of drug possession. On appeal from the defendant's conviction for possession of a controlled substance, we held that the officer's search could not be justified under the automobile exception because the pickup was not "operable" when the police first "encountered" it, despite the fact that it was moving when the officer first noticed it. *Id.* at 423-24.

In *State v. Burr*, 136 Or App 140, 901 P2d 873, *rev den* 322 Or 360 (1995), we returned to, and expanded, *Cromwell*'s "constructive mobility" principle. In *Burr*, an officer observed the defendants' pickup parked on the shoulder of the road with its lights off. The four defendants were standing outside of the pickup and were attempting to load a deflated rubber raft into the bed of the pickup. The officer stopped, got out of his car, and approached the defendants to

see if they needed assistance. The officer requested identification from the defendants and, after running an identification check, discovered that there was an outstanding arrest warrant for one of the defendants. The officer placed that defendant under arrest. Meanwhile, another officer arrived at the scene and, immediately upon getting out of his car, noticed a strong odor of marijuana coming from the bed of the pickup. That officer moved the raft, revealing two ice chests, with a marijuana leaf sticking out of one. He opened both chests and discovered that they were full of freshly cut marijuana. We held that the pickup was constructively occupied, and thus mobile, when first encountered:

> "The fact that [the] defendants were not in the cab of the vehicle is a mere fortuity. They need only have taken a few steps to have placed themselves in the vehicle in order to leave. In the light of the rationale for the rule, it would be a curious result to hold that the pickup was not mobile because defendants were standing outside the cab instead of sitting inside it when either circumstance would permit the driver to immediately drive off. In that sense, the pickup was 'occupied and operable' when the police first encountered it." *Id.* at 149.

In so holding, we distinguished *Kock* and noted that, while the defendant in *Kock* had "left the locale of the automobile," rendering the vehicle immobile, the truck in *Burr* was mobile because someone was "in the position to operate it and leave in it immediately when the police first encountered it."[7] *Burr*, 136 Or App at 149. *Contra id.* at 150 (Armstrong, J., dissenting).

Finally, and most recently, in *State v. Coleman*, 167 Or App 86, 2 P3d 399 (2000), we held that a search did not fall within the "constructive mobility" concept of the automobile exception. There, police officers were executing a search warrant of a residence when they first encountered the defendant, who was walking out of a motor home parked in the backyard of the residence and was only a few feet from a car

---

[7] We also noted that, at least in that regard, the vehicle in *Cromwell* was similarly mobile because someone was in a position to leave quickly when police first encountered it. *Burr*, 136 Or App at 149.

when stopped. During the ensuing pat-down, the officers discovered a set of keys. The officers then handcuffed the defendant and led him to the living room. Sometime after the initial encounter with the defendant, and, after he had been handcuffed and led away, one of the officers searched the car and found evidence of drug-related offenses. The trial court suppressed that evidence, rejecting the state's arguments that the search was justified under the automobile exception. We affirmed:

> "[The] applicability of the automobile exception turns on the mobility of the vehicle *when the police first encounter it.* The inquiry is centered on the circumstances surrounding the moment when the police first notice or focus their attention on an automobile. In a routine traffic stop, that moment is obvious: The police become aware of the automobile at or near the time that they discover a lawful reason for stopping it. The police in *Burr* and *Cromwell*, on the other hand, were not involved in what could be described as a routine traffic stop. Rather, in each of those cases, the officers pulled up next to or behind automobiles that were parked in the middle or on the side of a road. Nonetheless, as in a routine traffic stop, the police had focused their attention on the vehicle at the same time they encountered the defendants and under circumstances where the vehicle was attended and, to one extent or another, in use.

> "* * * The state argues that the automobile exception applies because [the defendant] was only a few feet away from his car and had keys in his pocket at the time [the officer] approached him. According to the state, [the defendant] was therefore in a position to operate it and leave in it immediately. The problem with the state's position is that there is no direct evidence in the record to support the state's assumption that the police had focused their attention on [the defendant's] car, or knew it to be [the defendant's] car, at the time they initially stopped and detained him." *Coleman,* 167 Or App at 94-95 (emphasis in original).

Thus, we held in *Coleman* that, even though the defendant was within a few feet of the car with keys in his pocket when he was stopped, the "constructive mobility" concept did not apply because the police had not focused their attention on the car at that time.

At the (obvious) risk of over-simplification, our review of Oregon's automobile exception case law suggests that cases within the exception fall into two groups: The "vehicle stop" cases and the "constructive mobility" cases. *Brown* and *Bennett* typify the former; *Cromwell* and *Burr* typify the latter.

Here, the search cannot be justified as falling within the "constructive mobility" principle: At the time the police approached the Mercury to search it, it was parked and unoccupied, and defendant was not near the car—indeed, defendant was nowhere to be seen, having fled the scene. *Compare Burr*, 136 Or App at 149 ("[The defendants] need only have taken a few steps to have placed themselves in the vehicle in order to leave."). Thus, if the search is to partake of the automobile exception, it must be under the "vehicle stop" rationale.

This is not, of course, a "garden variety" vehicle stop case—like *Brown* or *Bennett*—where the driver pulled over in response to a police command, and the search immediately ensued after the driver was taken into custody.[8] Indeed, the facts here are unprecedented in reported Oregon decisions: The police pursued defendant's car with overhead lights flashing; defendant successfully, if momentarily, eluded the police pursuit, violating several traffic laws in the process; when the police found defendant's car no more than two minutes later, it was parked and unoccupied. We emphasize that this was not a case like *Vaughn* where the police merely followed the defendants' car from a distance, without any show of authority. Rather, here, the police, through the show of flashing lights and the active pursuit, affirmatively commanded defendant to stop and defendant did not do so.

The applicability of the "vehicle stop" rationale thus reduces to whether the police "stopped" defendant's car— and, if so, when. *State v. Puffenbarger*, 166 Or App 426, 998 P2d 788 (2000), provides the answer.

---

[8] *See also State v. Custer*, 126 Or App 431, 434, 868 P2d 1363 (1994) (car that is moving when police initiated traffic stop is considered "mobile" for automobile exception purposes).

In *Puffenbarger*, two police officers approached the defendant, who was on foot, and asked him some questions, including whether he had ever been convicted of a crime. The defendant responded that he had only been convicted of some traffic crimes. The police then asked the defendant if they could search him, and he refused. The defendant asked if he was free to go, and the police said that he was. As the defendant walked away, the officers slowly followed him in their patrol car, without activating the overhead lights, siren, PA system, or side bar light. *Id.* at 429.

The officers followed the defendant, tracking his movements for 12 blocks. When the defendant altered his route to prevent the patrol car from following him, one of the officers got out of the car and followed him on foot. Ultimately, the officers determined from a records search that the defendant had a weapons conviction. They pulled up beside the defendant, who indicated that he did not want to interact with them. One of the officers called out from the patrol car, asking the defendant about the weapons conviction and what they would find if they searched him. Then, when one of the officers got out of the car, the defendant started running. The officer pursued on foot, shouting at the defendant to stop and telling the defendant that he was under arrest. At that point, the defendant discarded a handgun he had been carrying. The police ultimately captured the defendant and retrieved the gun. *Id.* at 429-30.

Following his conviction on a weapons charge, the defendant appealed, assigning error to the denial of his motion to suppress the gun. The defendant argued, particularly, that he had been unlawfully stopped when the officer called out to him to stop and that that stop was not supported by reasonable suspicion. The state responded that there had been no stop until the officer actually caught up to the defendant and physically restrained him—and that, at that point, there was reasonable suspicion, in part because the defendant had ignored the command to stop. The state did not dispute that the police lacked reasonable suspicion at the time the defendant was ordered to stop.

We reversed, concluding that, for purposes of Article I, section 9, of the Oregon Constitution, the defendant had

been stopped when he was ordered to stop. In so holding, we emphasized that the Oregon constitutional analysis required under *State v. Holmes*, 311 Or 400, 813 P2d 28 (1991), differs materially from, and yields a different result than, the Fourth Amendment analysis prescribed in *California v. Hodari D.*, 499 US 621, 111 S Ct 1547, 113 L Ed 2d 690 (1991). *Puffenbarger*, 166 Or App at 432-33. Under *Hodari D.*, where a defendant flees from the police and disregards a command to stop, there is no seizure for Fourth Amendment purposes because "[a]n arrest requires *either* physical force[9] * * * *or*, where that is absent, submission to the assertion of authority." 499 US at 626 (emphasis in original). In *Puffenbarger*, we rejected the state's argument that the officer's conduct and command "was merely an *attempt* to stop [the] defendant":

> "The state argues that * * *, until he was actually stopped by [Officer] Watts, it was not reasonable for [the] defendant to believe that his freedom of movement was being interfered with and that he was not 'seized' for constitutional purposes. We disagree. A person's freedom of movement may be interfered with, so as to constitute a seizure under Article I, section 9, not only by means of physical restraint but also by a show of authority such as occurred. * * * As discussed above, at the time that the police started chasing him, their show of authority was sufficient for [the] defendant to believe that his freedom of movement was being interfered with." 166 Or App at 435.

That analysis is dispositive here. After activating his patrol car's overhead lights, Officer Lucas pursued defendant at a high rate of speed through a residential neighborhood.[10] In response, defendant attempted to elude Lucas by driving at unlawful speeds, making at least three turns in rapid succession, running at least one stop sign, and then fleeing his

---

[9] The Court stated that "[t]he word 'seizure' readily bears the meaning of laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *Hodari D.*, 499 US at 626.

[10] We recognize that the mere brief activation of overhead lights does not constitute a sufficient show of authority to amount to a stop. *See State v. Blair/Vanis*, 171 Or App 162, 172-73, 14 P3d 660 (2000), *rev den* 332 Or 137 (2001) (disavowing *State v. Walp*, 65 Or App 781, 672 P2d 374 (1983)). Here, however, Lucas did much more than briefly activate his overhead lights.

car, all manifesting his subjective belief that Lucas's show of official authority not only was intended to—but had in fact—interfered with defendant's freedom of movement. In short, Lucas's pursuit of defendant effected a "stop" for purposes of Article I, section 9, of the Oregon Constitution, including the automobile exception as recognized under section 9. Because the Mercury was mobile at the time of that stop, and because, at the time of the search, which was proximate to the stop, the police had probable cause to believe the car contained evidence of a crime, the search was lawful under the automobile exception.[11]

Finally, we reject the dissent's opposing view for several reasons. First, contrary to the dissent, *Vaughn* is materially distinguishable because, unlike in this case, the officers there merely followed the car from a distance and never made any show of authority effecting a stop. *See Warner*, 117 Or App at 423 ("An 'encounter' does not include observation from a distance.").[12] Thus, there was no "stop" in *Vaughn*. Second, we perceive no constitutionally principled basis for delimiting "stop" differently in this context than in other contexts subject to Article I, section 9. *See Puffenbarger*. Finally, under the dissent, defendant (and his car) would be afforded greater constitutional protections by virtue of defendant's unlawful evasion and flight than they would enjoy if defendant had lawfully complied with the command to stop. We need not, and do not, sponsor such an ironic result.

---

[11] Here, we are not faced with, nor do we decide, the applicability of the automobile exception to "vehicle stop"/eluding cases in which there is a substantial interval between the police pursuit, the defendant's successful flight, and the ultimate discovery and search of the car. At least arguably, a significant passage of time could, in some circumstances, obviate the exigency justification for the exception. *Compare Burr*, 136 Or App at 149 ("The rationale underlying the automobile exception is to prevent evidence of criminal activity from being quickly moved out of the locality in which the warrant must be sought."), *with Kock*, 302 Or at 32-33 (applying automobile exception to searches of cars that have "just been lawfully stopped").

[12] With respect, the dissent mischaracterizes the facts. Officer Lucas was not merely "chasing [defendant's] car." 179 Or App at 236 (Wollheim, J., dissenting). He was pursuing defendant's car at high speed with overhead lights flashing. Nor did the officer merely "lose" the car. *Id.* Defendant eluded the pursuit by driving at excessive speeds, running a stop sign at 30-40 miles per hour, and making at least three turns in rapid succession.

The trial court erred in granting the motion to suppress.[13]

Reversed and remanded.

**WOLLHEIM, J.,** dissenting.

A police officer is chasing a car for speeding. The officer loses the car. When the officer finds the car, it is parked in a parking lot. Neither the car's driver nor the car's keys are present. Based on those facts, the majority concludes that the officer's warrantless search of the automobile was permissible under the automobile exception to the warrant requirement because the car was mobile. I disagree with the majority's application of the automobile exception to the warrant requirement. I, therefore, respectfully dissent.

"The rationale underlying the automobile exception is to prevent evidence of criminal activity from being quickly moved out of the locality in which the warrant must be sought." *State v. Burr*, 136 Or App 140, 149, 901 P2d 873, *rev den* 322 Or 360 (1995) (citing *State v. Brown*, 301 Or 268, 275, 721 P2d 873 (1986)). The exigency that allows police to circumvent the warrant requirement is the mobility of the vehicle at the time of the stop. *Brown*, 301 Or at 276. The mobility principle has justified warrantless searches subsequent to routine traffic stops, as was the case in *Brown*, as well as in cases where, although the vehicle is never seen moving, the car is constructively mobile when encountered by the police. *See State v. Cromwell*, 109 Or App 654, 659, 820 P2d 888 (1991) (car was sufficiently mobile to justify a warrantless search where the defendant was in his truck and the "fact that defendant had not yet turned the key was merely fortuitous"); *Burr*, 136 Or App at 149 (in light of rationale for the rule, a vehicle is "occupied and operable" where defendants are standing immediately outside truck parked along a public highway when police encounter it).

As the majority admits, this case does not present us with a routine traffic stop. Nonetheless, the majority holds that a "stop" occurred for purposes of Article I, section 9, of

---

[13] Given our disposition, we need not address the state's alternative arguments that other exigencies also may have justified the search.

the Oregon Constitution, at some time before the actual, physical stopping of the car and that thereafter the police could circumvent the warrant requirement once the vehicle was found. I disagree with the majority's conclusion that the search was lawful under the automobile exception.

Considering the rationale for the automobile exception, this case is more analogous to *State v. Vaughn*, 92 Or App 73, 757 P2d 441, *rev den* 306 Or 661 (1988). In *Vaughn*, the police suspected that the defendant was transporting narcotics and were following the defendant in his vehicle when the defendant pulled off the highway and stopped at a residence. The officers watched the residence for 25 minutes before they approached and ordered all of the occupants, including the defendant, out of the house, and then searched the defendant's vehicle. We held that the automobile exception did not apply because, "[a]lthough the vehicle was mobile when the police first saw it, it was not when they first confronted defendant." *Id*. at 77.

In the present case, even though the officer may have initiated a "stop" in a constitutional sense when he activated his overhead lights, neither defendant nor anyone else capable of operating the car was anywhere to be seen when the officer searched the vehicle.

I respectfully dissent.