Argued and submitted September 30, 2003, affirmed July 14, 2004

## STATE OF OREGON,
*Respondent,*

*v.*

## ALONZO L. LAWTON,
*Appellant.*

C00-02-31519; A117246

94 P3d 154

Jamesa J. Drake, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, Acting Executive Director, Office of Public Defense Services.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Leeson, Judge pro tempore.

EDMONDS, P. J.

Deits, C. J., concurring.

## EDMONDS, P. J.

■ Defendant appeals his conviction for felon in possession of a firearm. ORS 166.270(1). In the trial court, he moved to suppress evidence seized at the time of his arrest as the product of an illegal stop. He contended in his motion that he was stopped without reasonable suspicion. The trial court denied the motion, and defendant was convicted. On appeal, defendant reasserts his argument that he was unlawfully stopped when the police started to chase him after he ran from them, relying on *State v. Puffenbarger*, 166 Or App 426, 998 P2d 788 (2000). We affirm.

On February 2, 2000, City of Portland Police Officers Dalberg and Hattrick were patrolling in a marked police car in the area of Northeast Vancouver and Beach Streets, an area that had been designated by city ordinance as a drug-free zone. As Dalberg was driving down the street, he spotted a tall African-American male with a large build in a parking lot. The person was wearing a hood, but Dalberg was able to see his face and eyes, as well as his general silhouette. Based on his observations, Dalberg believed that the person he was observing was a person named Gainer. Dalberg had two or three prior contacts with Gainer, all of which had occurred in this particular area. During those contacts, Gainer had admitted to using drugs, and Dalberg knew that Gainer had previously been arrested for drug-related offenses. He believed that Gainer had been excluded from the area because it was a drug-free zone.[1]

The person that Dalberg had observed was standing about 50 feet away. Dalberg asked Hattrick to stop the patrol car, and he got out, stepped to the rear of the car, and shouted, "What's up, Gainer?" Dalberg was in full uniform,

---

[1] Specifically, Dalberg testified, "Gainer has told me that he uses drugs. He has been arrested for drugs[,] and I believe he might have [had] a drug-free zone exclusion at that time. Plus, I had not seen Mr. Gainer for approximately two months prior to that. I said, 'Hey, I think that is Gainer. I want to talk to him for a second.' " Dalberg was asked whether he believed at the time that Gainer was excluded from the drug-free zone, and Dalberg answered, "Yes[.]" On cross-examination, Dalberg was not asked about his belief regarding the exclusion, other than whether he obtained a records check on Gainer before he made the contact with the person that turned out to be defendant. He testified that he had not sought a records check before getting out of the patrol car.

and the person he addressed was facing him. No sirens or flashing lights on the patrol car were activated at the time. The person Dalberg had addressed (defendant) did not say anything in response; instead, he turned and ran.

Dalberg followed defendant across the parking lot between a house and a fence, into an alley, believing that he was pursing Gainer. As he followed defendant, Dalberg saw him swing his right arm from his waistband as if he was in the act of throwing something. Dalberg heard a thud that sounded like a gun hitting the ground. The pursuit continued until a second patrol car arrived on the scene. The occupants of that car were able to detain defendant before Dalberg could reach him. When Dalberg was able to view the face of the person he had been pursuing, he realized for the first time that he had not pursued Gainer, but, in fact, defendant, whom he had mistakenly thought was Gainer.

Dalberg retraced the path of his pursuit and found a handgun about 20 feet away from where he had seen defendant throw something while he was running from the officer. As a result of the seizure of the weapon, defendant was charged with the crime of felon in possession of a firearm. On appeal, defendant claims that he was unlawfully stopped because the police lacked reasonable suspicion to believe that either he or Gainer had committed any crime.

■      ORS 131.605(6) defines a stop as a "temporary restraint of a person's liberty by a peace officer lawfully present in any place." A "stop" is distinguishable from ordinary types of police-citizen encounters in which questioning occurs through mere conversation without any restraint of liberty. The former is legally justified only by reasonable suspicion of criminal activity. The latter requires no justification. *State v. Warner*, 284 Or 147, 161, 585 P2d 681 (1978). Defendant was clearly stopped within the meaning of the statute when he was detained by the second patrol car. However, we need not determine whether he was "stopped" before that time as the result of Dalberg's pursuit because, even if that is the case, we conclude that Dalberg had a reasonable suspicion that Gainer, the person Dalberg thought he was pursuing, was unlawfully within a designated drug-free zone.

The fact that defendant turned out not to be Gainer is one of several facts in this case that informs the inquiry regarding the reasonableness of Dalberg's pursuit. Those cases that have considered facts of mistaken identity regarding issues of reasonable suspicion or probable cause have focused on the reasonableness of the mistake itself. *See, e.g., Hill v. California*, 401 US 797, 804 , 91 S Ct 1106, 28 L Ed 2d 484 (1971) (arrest of wrong individual was not invalid where police officers had a subjective good-faith belief that the person they had in fact arrested was the person the police had probable cause to arrest); *see also United States v. Lang*, 81 F3d 955 (10th Cir 1996) (suspicion not rendered unreasonable because identification was mistaken but reasonable); Wayne R. LaFave, 3 *Search and Seizure* § 3.2(d), 45-46 (3d ed 1996) (an arrest that is otherwise valid is not rendered illegal on the ground that the arrestee was mistaken for the person sought). Here, Dalberg based his conclusion that defendant was Gainer on his prior contacts with Gainer, his belief that Gainer was excluded from the area, and his observation of defendant's size and stature.

Dalberg's subjective belief that defendant was Gainer is uncontroverted. Dalberg said to his fellow officer, "Hey, I think that is Gainer. I want to talk to him for a second." Dalberg stepped from his car and said, "What's up, Gainer?" Defendant, however, also challenges the objective reasonableness of Dalberg's belief. He points out that he is an African-American with a light complexion and six feet, six inches tall, while Gainer is an African-American with a medium complexion, six feet tall and weighing between 190 and 200 pounds. Defendant concludes, "It is simply not objectively reasonable for an officer to stop a black man, in a predominately African-American neighborhood, because he resembles someone who has previously admitted to drug use."

Defendant's argument fails to take into account the other pertinent facts in the record. Dalberg's contact with defendant occurred at 12:30 a.m. in a high-crime area that was a drug-free zone. He had made numerous arrests in the area for drugs and was aware that "there are certain rules that state when you can be there. And * * * if you don't follow those rules, you can be arrested for Criminal Trespass[.]" The

parking area where Dalberg observed defendant had some lighting, and there was also lighting in the area from an adjacent market. Defendant's body was silhouetted in the lights and was "[p]robably 50 feet or so" from the patrol car. Dalberg testified he had previously talked to Gainer on "two or three occasions" in the same area. One contact had occurred approximately two months before this contact. Dalberg explained, when asked what he could observe, that he looked at the facial features and the body type of the person in the parking lot. He added, "I could see his face. I could see his eyes. Just his basic silhouette[,] and it appeared to be * * * Gainer."

Defendant's argument implies that Dalberg's suspicion was merely a generalized suspicion about African-Americans. However, Dalberg's testimony belies that assertion. The fact that defendant is of lighter complexion than Gainer is of little import considering the lighting conditions that existed at the time. Similarly, the difference in height of the two individuals, when observed from a distance of 50 feet under those conditions, does not, in our view, substantially detract from the objective reasonableness of Dalberg's belief that it was Gainer. Based on the circumstances of his observation and his prior contacts with Gainer, we conclude that Dalberg reasonably believed that the person he was pursuing was Gainer, a person who could not lawfully be in the area.

It follows that Dalberg's initial pursuit of defendant was lawful. During the pursuit, defendant's conduct prompted an additional reasonable suspicion that he had committed a crime. Dalberg saw defendant discard what the officer believed to be a gun under circumstances that would lead a reasonable person to believe that defendant could not lawfully possess a firearm. Consequently, we reject defendant's assertion that the trial court incorrectly concluded that Dalberg had reasonable suspicion to stop defendant.

The concurrence would decide the issue in this case by holding that defendant was not "stopped" when Dalberg pursued him, by distinguishing the pursuit of defendant from the pursuit of the defendant in *Puffenbarger*. In that case, the police initially contacted the defendant, who was walking on the sidewalk, and asked him for identifying information. In

addition, they inquired whether he had ever been arrested. The defendant told the officers that he had been arrested, but only for traffic matters. They asked him for consent to search his person but he refused. The defendant then asked if he was free to leave, and the police told him that he was. However, as the defendant left, they followed him for a distance of 12 blocks, even as he changed directions. During that time, they called out questions to him as they drove their car on the wrong side of the street. When the defendant's route did not permit the officers to follow him in their police car, the officers got out of their car and ran after him as the defendant attempted to leave their presence. We held on those facts that it was reasonable for the defendant to believe that the police were attempting to exercise their authority and to interfere with his liberty and freedom of movement. Consequently, we concluded that a stop had occurred.

Here, it is not necessary to engage in fact-matching with *Puffenbarger*. Unlike in *Puffenbarger*, Dalberg had an initial reasonable suspicion that the person with whom he was making contact was committing a criminal offense in Dalberg's presence. Therefore, it makes no difference to our decision when Dalberg stopped defendant.

Affirmed.

**DEITS, C. J.,** concurring.

I agree with the majority that the trial court correctly denied defendant's motion to suppress. My concern with the majority's decision is that it assumes that a stop occurred at the time of the officer's initial contact with defendant. That assumption is misleading in the sense that it can be understood to imply that we agree with defendant and the trial court that a stop did occur at that time. I believe that we should take this opportunity to clarify the law, in particular our decision in *State v. Puffenbarger*, 166 Or App 426, 998 P2d 788 (2000), the case relied on by both defendant and the trial court in determining that defendant was stopped when Officer Dalberg began his pursuit.

The majority concludes that it need not resolve the issue whether a stop occurred at that point because, whether or not Dalberg's pursuit constituted a stop, he had reasonable

suspicion to justify a stop at the outset of the encounter. I agree that Dalberg had reasonable suspicion at the beginning of his contact with defendant. But reasonable suspicion was not necessary at that point because, under these circumstances, defendant was not stopped until the police actually detained him—at which point it is undisputed that the police had reasonable suspicion to stop defendant.

Under Article I, section 9, of the Oregon Constitution, a seizure of a person occurs

> "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances."

*State v. Holmes*, 311 Or 400, 409-10, 813 P2d 28 (1991). An encounter between the police and a citizen is a seizure only when "[an] officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens." *Id.* at 410.

Citing this court's decision in *Puffenbarger*, the trial court ruled that the stop occurred at the time that Dalberg began to pursue defendant. As mentioned above, the majority implicitly agrees with the trial court as to that determination. I do not agree. Under the totality of the circumstances, defendant was not stopped for purposes of Article I, section 9, until the police detained him. The trial court's conclusion— that, under *Puffenbarger*, defendant was stopped when Dalberg gave chase—overstates the reach of that decision, and we should take this opportunity to clarify our ruling in that case.

In *Puffenbarger*, the police initially contacted the defendant while he was walking on the sidewalk and asked him for identifying information and whether he had ever been arrested. The defendant responded that he had, but only for traffic matters. Police asked for consent to search, but the defendant refused. The defendant asked

if he was free to leave, and the police told him that he was. *Puffenbarger*, 166 Or App at 428.

Police ran a criminal background check of the defendant on the mobile computer in their patrol car. The computer was slow to return that information, and, while it was processing the officers' request, the police followed the defendant from a short distance. At one point, an officer had to leave the patrol car and follow the defendant on foot in order to maintain visual contact because the car was blocked by a dead end. When the information finally came back on the computer, it indicated that the defendant had, in fact, been arrested previously on a weapon offense. *Id*. at 428-29.

When the information about the defendant's weapon violation came back, the police pulled alongside the defendant and asked him about the violation, why he had not mentioned it before, and what they would find if they searched him. The officers stopped their car and one of them got out of the vehicle and approached the defendant, at which point the defendant fled. The police pursued the defendant, ordering him to stop and telling him that he was under arrest. During the pursuit, the police saw the defendant reach behind a small boat and heard a thud. The police finally arrested the defendant on his porch and later recovered a firearm where they had seen the defendant at the boat. The defendant was eventually convicted of felon in possession of a firearm. *Id*. at 428-30.

Before trial in *Puffenbarger*, the defendant moved to suppress all evidence of the firearm and statements that he had made, arguing that the stop was not supported by reasonable suspicion. The trial court denied the motion, reasoning that the analysis was the same under both the Oregon and federal constitutions and concluding that the stop had not occurred until police had physically apprehended the suspect. We reversed and remanded, noting that the analysis is not identical under state and federal law because, under the Oregon Constitution, a defendant need not submit to physical force or police authority for a stop to occur. *Id*. at 432-33, 435 (comparing *Holmes*, 311 at 409-10, with *California v. Hodari*, 499 US 621, 626, 111 S Ct 1547, 113 L Ed 2d 690 (1991)).

As we explained in *Puffenbarger*, our holding in that case was based on the totality of the circumstances. What was critical to our decision was not the final pursuit by police, but rather the extent and nature of their show of authority preceding the pursuit. We noted that the police had followed the defendant for 12 blocks, even as he changed directions and even when the route required an officer to leave the vehicle. The officers called out questions to the defendant from their car as they drove against traffic and they eventually stopped the car, got out, and approached the defendant before he fled. That conduct went significantly beyond what would be acceptable between ordinary citizens and amounted to more than an inconvenience or annoyance to the defendant. The extensive show of police authority in that case made reasonable the defendant's belief that he had been stopped and, thus, made the interaction a seizure. 166 Or App at 434-35.

Our decision in *State v. Snow*, 179 Or App 222, 39 P3d 909 (2002), also highlights the importance of a demonstration of police authority. In *Snow*, the police witnessed the defendant "laying rubber" while making a turn and rapidly driving away. The police made a U-turn, activated their overhead lights, and pursued the defendant. The pursuit continued through a residential neighborhood, and the police eventually found the car that the defendant had been driving unattended. When a license plate check returned information that the registered owner of the vehicle did not fit the description of the defendant, the police searched the car in order to find some evidence of the defendant's identity. In the course of that search, the police discovered a shotgun. The defendant was ultimately arrested and charged with felon in possession of a firearm and reckless driving. *Id.*

In *Snow*, we reversed the trial court's grant of the defendant's motion to suppress because the search of the vehicle fit the automobile exception to the warrant requirement. Citing our reasoning in *Puffenbarger*, we ruled that the stop occurred when the police turned on the emergency lights and began the pursuit of the defendant. *Snow*, 179 Or App at 233-35 (citing *Puffenbarger*, 166 Or App at 435). The critical component that made that interaction a stop was the nature of the police show of authority—by activating the overhead

lights—in conjunction with the pursuit. As any driver knows, the use of overhead lights by a police officer following the driver's vehicle is an unequivocal command to pull the car over. That is the sort of demonstration of authority that turns an otherwise innocuous interaction between a citizen and an officer into a seizure under Article I, section 9, of the Oregon Constitution. *See also State v. Juarez-Godinez,* 326 Or 1, 6, 942 P2d 772 (1997) (citing *State v. Warner,* 284 Or 147, 165-66, 585 P2d 681 (1978)) (stop may result from "mere show of authority").

In this case, defendant's first response to Dalberg's initial—and very limited—contact was to flee. Dalberg, suspecting defendant of violating a drug-fee zone exclusion, followed on foot. Significantly, there is no evidence that, before or in the course of that pursuit, Dalberg ordered defendant to stop or otherwise asserted his authority in any manner that would reasonably lead defendant to believe that he was required to submit to that authority. Dalberg simply followed defendant. I do not understand how that amounts to an intentional and significant deprivation of, or interference with, defendant's liberty. Nor do I understand a simple foot pursuit to be so significantly out of the realm of ordinary social intercourse that it would be an offensive contact if it occurred between two citizens, as would be required under the second prong of the *Holmes* test. If the facts of this case constitute a stop, then *any* time a uniformed officer follows a citizen who is attempting to avoid mere conversational contact with the police, a stop has occurred. That cannot be correct. That is simply not a sufficient show of authority or interference with a citizen's liberty to constitute a stop under Article I, section 9. The trial court erred in ruling that the officer's greeting and subsequent pursuit, without more, constituted a stop. Defendant, in this case, was not subject to a stop until police detained him, at which time they clearly had reasonable suspicion to justify the stop.

For the reasons stated above, I concur.