Argued and submitted March 31, 1999, reversed and remanded April 12, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## JOHNNY RANDOLPH PUFFENBARGER,
*Appellant.*

## (C9704-32861; CA A100009)

998 P2d 788

Andy Simrin argued the cause for appellant. On the brief were David E. Groom, Public Defender, and Diane L. Alessi, Deputy Public Defender.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

DEITS, C. J.

## DEITS, C. J.

Defendant appeals his conviction of felon in possession of a firearm. ORS 166.270. He was convicted on stipulated facts after the trial court denied his motion to suppress evidence seized and statements that he made at the time of his arrest. We reverse.

■ The trial court made extensive findings of fact that we conclude are supported by constitutionally sufficient evidence in the record. Accordingly, we are bound by the court's factual findings. *State v. Ehly,* 317 Or 66, 75, 854 P2d 421 (1993). The trial court found:

"Officer Watts saw [defendant] walking on the sidewalk in Northeast Portland about 3:30 a.m. on April 11, 1997 but made no contact with him.

"Officer Watts and his partner, Officer Ossenkop, Officer Ossenkop being the driver of their marked patrol vehicle, saw the defendant about 20 minutes later still walking about nine blocks from the place of the initial sighting if you will by Officer Watts. The officers at that time were out of their patrol vehicle completing a conversation with other people, clearing that contact as they say.

"They engaged in conversation with [defendant], asked him his name, his date of birth and his address. They did not ask him to alter his direction or interfere with his freedom of movement. They did not obtain or ask or get their hands on any form of identification from him.

"In that conversation, one of the officers asked [defendant] if he had been arrested before. [Defendant] said he had been arrested only for traffic matters. Officer Watts asked the defendant if he would consent to a search of his person and [defendant] said no. [Defendant] asked if he was free to go. Officer Watts told him he was. [Defendant] walked away.

"Officer Watts then ran [defendant's] name on the MDT, the mobile computer in the patrol car. The response on the computer was slow, apparently often is. And eventually information came back on [defendant's] name including information that he had been arrested in September of 1996 for a weapon's offense.

"While they were waiting for the information to come back on the computer, the officers followed [defendant] rolling slowly in the patrol vehicle at about 50 to a hundred feet behind [defendant] where [defendant] was on the sidewalk. They rolled along at about the same speed [defendant] was walking. They didn't have overhead lights on, no siren, didn't use their PA system or their side bar light while they were awaiting this information from the computer.

"When the computer information came back, this was after many blocks of following including a period during which Officer Watts got out of the patrol vehicle and kept visual contact with [defendant] while Officer Ossenkop took the patrol vehicle around where 14th Place didn't go through and then Watts got back in the car.

"Anyway, after these many blocks of following [defendant] after the return of this information, the officers pulled their patrol vehicle up along [defendant].[1]

"Now, during this time period, I'm not sure whether this is a finding or a conclusion but [defendant] did not want to interact with the police any further and he manifested that clearly by his conduct.

"When the patrol vehicle pulled up along of [defendant], again Officer Ossenkop called out to the defendant, asked him in some sense or some words what was the situation with the weapon's arrest, what was the deal with that or why had he not mentioned it before, and Officer Ossenkop also asked [defendant] what he would find if he searched him.

"As this conversation is occurring Officer Ossenkop stopped the patrol vehicle. Officer Watts got out. And as Officer Watts got out of the patrol vehicle, [defendant] started running. Officer Watts chased after him.

"As Officer Watts followed [defendant], he observed [defendant] cross 9th Street or 9th Avenue outside of the crosswalk area, crosswalk in this situation being defined as an imaginary extension of the sidewalk because there were no painted markings, and also saw [defendant] make that

_____

[1] At this point, when the officers pulled up alongside defendant they were driving next to the curb in the oncoming lane, so that Ossenkop was talking to defendant out the driver's side window.

street crossing at approximately a 35 to 40 degree angle to the street, not perpendicular.

"After this street crossing by [defendant], Officer Watts yelled at the defendant to stop and told him that he was under arrest. [Defendant] continued running and at the apartment complex where he resided reached a boat leaning against, a small boat leaning against a wall and reached behind that boat. Officer Watts heard a sound when he saw [defendant] with his hand between the wall and the boat, heard a sound that in Officer Watts' experience was consistent with a thud, metallic thud, consistent with the sound of a metal gun hitting the ground.

"[Defendant] reached his back porch, laid down on his back, out of breath, pounded on the door yelling for his partner, Ms. Nagy, to come out.

"When Officer Watts reached [defendant] on his porch in that position, he was continuing to yell at [defendant] that he was under arrest and attempting to gain compliance so he could be handcuffed.

"Officer Watts used physical force several times on [defendant] to gain his compliance with his commands and to get [defendant] into handcuffs including blows to the back or back of the neck and knee, to [defendant's] side.

"Officer Watts finally succeeded in handcuffing [defendant], left him briefly under the supervision of other officers who had arrived at the scene, went back to the boat and found state's exhibit 1, the gun.

"* * * When [defendant] dropped the gun between the boat and the wall, he intended to abandon it there so it would not be found on him.

"When Officer Watts, after he found the gun, returned to the defendant, he took him to his patrol car. While he was still standing outside of the patrol car, advised [defendant] of his rights per *Miranda*.

"* * * * *

"Officer Watts then conducted a search of [defendant] incident to his arrest and pursuant to Portland City Ordinance Inventory of Persons and in that search found state's exhibits 2 and 3 in [defendant's] inside jacket pocket.

"[Defendant] then made statements in response to questions by Officer Watts about the gun and the ammunition. He made those statements out of a desire to explain himself and not out of fear of further beating by Officer Watts.

"* * * * *

"But actually, I didn't make this as a finding but I could find it if necessary. I don't believe Officer Ossenkop actually said we are going to search you anyway. I think that is what [defendant] believed. And I think that is why he took off because he knew this was coming, these cops were not going to give up. They were just going to keep after him until they found some reason to stop him despite the fact that he said he wanted to get away."

Before trial, defendant moved to suppress "the stop of defendant and all statements attributed to defendant on the grounds that said stop was without a reasonable suspicion to believe that defendant had engaged in criminal activity and that the statements were elicited in violation of defendant's rights under statute and under federal and state constitutions." The trial court denied defendant's motion. The court agreed with the state's contention that the analysis of whether defendant was stopped or "seized" is the same under Article I, section 9, of the Oregon Constitution,[2] and the Fourth Amendment to the United States Constitution.[3] Based on that premise, the court then concluded that defendant was not stopped until Watts made physical contact with him on the porch because, until that time, defendant had not submitted to the authority of the police. The trial court explained:

"* * * I think under either state or federal law the result is the same. I find nothing in the Oregon case law that suggests that our Oregon Appellate Courts have interpreted the Oregon constitutional provisions any differently than

---

[2] Article I, section 9, of the Oregon Constitution, provides, in pertinent part:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects against unreasonable search, or seizure[.]"

[3] The Fourth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, provides, in pertinent part:

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated[.]"

the U. S. Supreme Court has interpreted the federal constitution with respect to what constitutes a seizure of the person and arrest in the constitutional sense and that in fact the standard is the same. There has to be either a physical laying on of hand, even if the defendant subsequently, you know, slips away from that, or it is by—or the defendant has to submit to a show of authority without the actual laying on of hand. I think that is the same standard under Oregon.

"* * * * *

"There was not—even though there was that display of authority by the chase, there wasn't an arrest or constitutional seizure because [defendant] didn't submit to that display of authority."

On appeal, defendant assigns error to the trial court's denial of his motion to suppress. Defendant argues that he was stopped when Watts began to chase him. At that time, defendant asserts, the officers lacked a reasonable suspicion that he had committed a crime and, therefore, the stop was an unlawful seizure under Article I, section 9, of the Oregon Constitution, and the evidence obtained as a result of that seizure must be suppressed.

■ As noted above, the trial court made extensive findings of fact that are supported by the record. Consequently, our function on review is to evaluate the totality of the circumstances to determine if the trial court applied legal principles correctly to those facts. *Ehly*, 317 Or App at 74-75. We begin by concluding that the trial court erred in holding that the legal analysis would be the same under either state or federal law. The protection against unlawful seizure under Article I, section 9, of the Oregon Constitution, as defined by the Oregon courts, is not identical to that offered by the Fourth Amendment as it has been defined by the United States Supreme Court. *Compare State v. Holmes,* 311 Or 400, 409-10, 813 P2d 28 (1991) (stop occurs when suspect believes, and such belief is objectively reasonable, that an officer has intentionally and significantly interfered with suspect's freedom of movement), *with California v. Hodari,* 499 US 621, 626, 111 S Ct 1547, 113 L Ed 2d 690 (1991) (actual physical restraint or compliance with show of authority required).

In *Hodari*, the United States Supreme Court case on which the trial court based its decision, the defendant ran from the police and kept running and did not comply with the "show of authority" of the police officers who were chasing him and calling for him to stop. The Supreme Court held that the defendant was not seized because "[a]n arrest requires either physical force (as defined above)[4] or, where that is absent, submission to the assertion of authority." *Hodari*, 499 US at 626. However, under Article I, section 9, of the Oregon Constitution, a "seizure" occurs

> "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable in the circumstances." *Holmes*, 311 Or at 409-10.

As can be seen, unlike the analysis under the Fourth Amendment, the Oregon Constitution does not require a submission to authority or the use of physical force for police action to constitute a seizure.

We first consider whether the officer's conduct here was a seizure under Article I, section 9. *State v. Gerrish*, 311 Or 506, 510, 815 P2d 1244 (1991). The Oregon Supreme Court has identified three types of street encounters between police officers and citizens: (1) an "arrest," which must be justified by probable cause; (2) a "stop," which is a temporary restraint justified by reasonable suspicion that the citizen is involved in criminal activity; and (3) "mere conversation," which requires no justification and involves no restraint of the citizen. *See, e.g., State v. Dahl*, 323 Or 199, 206, 915 P2d 979 (1996); *Holmes*, 311 Or at 407; *State v. Warner*, 284 Or 147, 161, 585 P2d 681 (1978). Of these categories, only arrests and stops constitute seizures under Article I, section 9.

The determination of whether a police-citizen encounter is a seizure within the meaning of Article I, section

---

[1] The Court stated that "[t]he word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *Hodari*, 499 US at 626.

9, requires "a fact-specific inquiry into the totality of the circumstances." *Holmes,* 311 Or at 408. In discussing how to distinguish between a police-citizen encounter that represents mere conversation and one that constitutes a stop requiring reasonable suspicion, the Supreme Court explained:

> "Under these 'seizure' standards, law enforcement officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9 'seizure' merely because the encounter may involve *inconvenience or annoyance for the citizen* and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.,* policeman tapping citizen on the shoulder at the outset to get a citizen's attention). *See* LaFave, 3 Search and Seizure, A Treatise on the Fourth Amendment 413, § 9.2(h) (2d ed 1987). Rather, the encounter is a 'seizure' of a person only if the officer engages in conduct significantly beyond that accepted in ordinary social intercourse. The pivotal factor is whether the officer, even if making inquiries a private citizen would not, has otherwise conducted himself in a manner that would be perceived as a nonoffensive contact it if had occurred between two ordinary citizens." *Holmes,* 311 Or at 410 (emphasis added).

As the trial court found, defendant subjectively believed that the officers wanted to interfere with his freedom of movement. The determination of defendant's subjective belief is a question of fact for the trial court. The determination of whether defendant's belief was objectively reasonable requires an independent assessment by this court. *State v. Toevs,* 327 Or 525, 535, 964 P2d 1007 (1998).

■ Here, the officers had followed defendant for approximately *twelve* blocks, even as he changed directions, and, when his route did not permit the police car to follow, Watts followed defendant on foot until the car was once again able to proceed behind defendant. The officers called out questions to defendant from their car as Ossenkop drove it on the wrong side of the street and, eventually, they stopped the car,

got out, and walked toward defendant. As the officers approached him, defendant tried to leave their presence by running away, but they ran after him. The officers' conduct here was significantly beyond what would be acceptable from an ordinary citizen and amounted to more than an inconvenience or annoyance to defendant. We conclude that defendant's belief was objectively reasonable under the totality of the circumstances here. A reasonable person could have believed that, by their conduct, the officers here were manifesting an intent to restrict or interfere with his freedom of movement.

■   The state argues that the officers' pursuit of defendant was merely an *attempt* to stop defendant, that Watts did not explicitly tell defendant to stop and that, until he was actually physically stopped by Watts, it was not reasonable for defendant to believe that his freedom of movement was being interfered with and that he was not "seized" for constitutional purposes. We disagree. A person's freedom of movement may be interfered with, so as to constitute a seizure under Article I, section 9, not only by means of physical restraint but also by a show of authority such as occurred here. *State v. Juarez-Godinez,* 326 Or 1, 6, 942 P2d 772 (1997); *State v. Powelson,* 154 Or App 266, 274, 961 P2d 869 (1998); *State v. Johnson,* 105 Or App 587, 591, 805 P2d 747 (1991); *State v. Canape,* 46 Or App 453, 457, 611 P2d 1190 (1980). As discussed above, at the time that the police started chasing him, their show of authority was sufficient for defendant to believe that his freedom of movement was being interfered with. At that time, as the state acknowledges, the officers did not have a reasonable suspicion that defendant had committed a crime. Consequently, the evidence obtained as a result of the stop must be suppressed.[5] Accordingly, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

---

[5] In view of our conclusion, it is unnecessary to address defendant's arguments that the trial court erred in concluding that the officers' conduct violated the Fourth Amendment and that any reasonable suspicion based upon the officers' observation of defendant's violation of Portland's jaywalking ordinance did not assist the state because the city's ordinance was preempted by state law.