Argued and submitted May 16, affirmed September 27, petition for review denied
December 19, 2006 (342 Or 254)

STATE OF OREGON,
*Respondent,*

*v.*

ERIC ARTHUR SCATCHARD,
*Appellant.*

02CR1813MI; A124319

145 P3d 237

Charles F. Lee argued the cause for appellant. With him on the brief was Lee & Kaser, P.C.

Robert M. Atkinson, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge,* and Barron, Judge pro tempore.**

BARRON, J. pro tempore.

---

* Schuman, J., *vice* Ceniceros, S. J.
** Barron, J. pro tempore, *vice* Wollheim, J.

**BARRON, J. pro tempore**

Defendant appeals his conviction for driving under the influence of intoxicants in violation of ORS 813.010 on the ground that the trial court erred by denying his motion to suppress. Specifically, defendant argues that he was illegally seized when a volunteer fireman told him to stay at the scene of an accident until the police arrived. We affirm the trial court's denial of defendant's motion to suppress because we conclude the volunteer fireman did not seize defendant within the meaning of Article I, section 9, of the Oregon Constitution.

Although the trial court made no written findings of fact, we will presume that the facts were decided in a manner consistent with the court's ultimate conclusion if there is constitutionally sufficient evidence in the record to support that presumption. *See State v. Ehly*, 317 Or 66, 74-75, 854 P2d 421 (1993). We take the following facts from the record. On August 2, 2002, at about 10:52 p.m., Daniel Tilson, a volunteer Fire Chief of the Glide Rural Fire Protection District (fire department), was driving home from Portland in his private vehicle when he saw a vehicle on its side in a ditch. Tilson had just observed that same vehicle pass him while being driven erratically. Tilson stopped at the scene of the accident, called the emergency dispatch center, mounted a red emergency light on the roof of his vehicle, and climbed down the embankment toward the vehicle. Tilson called out to defendant, who responded that he was not injured. Tilson told the defendant that emergency vehicles were on their way. Within minutes, a Glide fire truck and ambulance and another ambulance arrived at the scene. Volunteer firefighters cut the windshield from defendant's vehicle and helped him crawl out. By that time, several other emergency vehicles had arrived on the scene, each with flashing emergency lights.

While emergency medical technicians (EMTs) examined defendant, Tilson watched from a distance. Based on his observations of defendant's driving and the smell of alcohol, Tilson believed that defendant was impaired in some way. Defendant refused medical treatment and asked one of the

fire department volunteers, who was a longtime friend of defendant, for a ride home. That volunteer, Woody Fugate, responded, "No, I can't, you have to stay here." Defendant asked why Fugate would not give him a ride, and Fugate responded that defendant "ha[d] to stay for the officer" who was on his way to the scene.

Defendant testified that he then "started to walk up the road * * * once and [Fugate] told me no, you can't walk up the road * * * you've got to wait here, there's an officer coming." Defendant chose to wait because the fire department volunteers were "friends of mine and I was taught to respect authority figures so, you know, when they said I had to stay I thought I had to stay." None of the emergency workers, including Tilson and Fugate, took any other action to restrain defendant's physical liberty at any time.

When the officer arrived on the accident scene, he requested that defendant perform field sobriety tests. Defendant declined to do so, and the officer arrested him. At the station, defendant took a Breathalyzer test, which revealed that his blood alcohol content exceeded the legal limit for persons operating motor vehicles. *See* ORS 813.010(1)(a).

■ Before trial, defendant moved to suppress the evidence resulting from defendant's arrest by the officer on the ground that it was obtained in violation of Article I, section 9, of the Oregon Constitution.[1] Specifically, defendant argued that he was arrested at the scene of the accident by Fugate, who told him to wait for the officer to arrive, even though Fugate had no statutory authority to arrest him. For that reason, defendant asserts that any evidence flowing from his contact with the officer should be suppressed. The state contended that defendant was not seized by the volunteer firefighters, and, even if he was, the seizure was authorized as a citizen's arrest under ORS 133.225.[2] The court denied the

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[2] ORS 133.225(1) provides:

"A private person may arrest another person for any crime committed in the presence of the private person if the private person has probable cause to

motion to suppress, explaining that "the detaining authority, Glide Fire Department, * * * [has] the authority to make a citizen's arrest." On appeal, defendant argues that the trial court erred in holding that a government agency may conduct a citizen's arrest under ORS 133.225.

■ Although the trial court implicitly concluded that defendant was detained at the scene of the accident, the concept of what constitutes a "seizure" under Article I, section 9, is a legal one. *See Ehly,* 317 Or at 75; *State v. Linville,* 190 Or App 185, 190, 78 P3d 136 (2003), *rev den,* 337 Or 34 (2004). We are not bound by the trial court's legal conclusions, and we may affirm on an alternate basis if the record below was fully developed and supports our ultimate conclusion. *See Ehly,* 317 Or at 75 (explaining the standard of appellate review of motions to suppress); *Outdoor Media Dimensions Inc. v. State of Oregon,* 331 Or 634, 659-60, 20 P3d 180 (2001) (describing the "right for the wrong reasons" principle of appellate jurisprudence); *State v. Rogers,* 330 Or 282, 295-96, 4 P3d 1261 (2000) (same). We have not previously addressed whether a fire department volunteer may make a citizen's arrest, and we do not address that issue in this case because we conclude that Fugate's conduct did not constitute a seizure of defendant's person.

■ A person is seized within the meaning of Article I, section 9, when a state actor (usually but not always a law enforcement officer, *see, e.g., State v. Tucker,* 330 Or 85, 997 P2d 182 (2000) (a tow truck driver acting under the direction of the police); *State v. Okeke,* 304 Or 367, 745 P2d 418 (1987) (an employee of a state-funded detoxification center)) "intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement," or if the individual believes the state actor has done so and that belief is objectively reasonable. *See State v. Holmes,* 311 Or 400, 409-10, 813 P2d 28 (1991). To determine whether a person has been "seized" under Article I, section 9, we conduct a fact-specific inquiry examining the totality of the circumstances of the particular case. *Id.* at 408.

_____

believe the arrested person committed the crime. A private person making the arrest shall, without unnecessary delay, take the arrested person before a magistrate or deliver the arrested person to a peace officer."

A constitutionally significant interference with a person's liberty may occur either by physical force or a show of authority. *Id.* Defendant does not contend that any fire department volunteer physically restrained him; thus, we must determine whether Fugate detained him by a show of authority, or whether defendant had an objectively reasonable belief that Fugate had so detained him. *See id.* at 409-10. In deciding whether a show of authority implicates Article I, section 9, the pivotal consideration is whether "the [detaining authority], even if making inquiries a private citizen would not, has otherwise conducted [himself or herself] in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens." *Id.* at 410.

We first consider whether Fugate's conduct resulted in a detention by a show of authority. Prior decisions are instructive in determining whether Fugate's conduct in telling defendant that he needed to stay at the scene until an officer arrived violated defendant's constitutionally protected right against unreasonable seizure. Cases in which a defendant was seized by a show of authority have involved the following circumstances: a law enforcement officer (1) retaining a defendant's identification, *see, e.g., State v. Painter*, 296 Or 422, 676 P2d 309 (1984); *State v. Atkin*, 190 Or App 387, 78 P3d 1259 (2003), *rev den*, 339 Or 230 (2005); (2) running a warrants check on the defendant, *see, e.g., State v. Hall*, 339 Or 7, 115 P3d 908 (2005); (3) pursuing the defendant, *see, e.g., State v. Puffenbarger*, 166 Or App 426, 998 P2d 788 (2000); *but see State v. Lawton*, 194 Or App 190, 200, 94 P3d 154 (2004), *rev den*, 338 Or 16 (2005) (Deits, C. J., concurring) ("The trial court erred in ruling that the officer's greeting and subsequent pursuit, without more, constituted a stop."); and (4) summoning defendant to a particular place, *see, e.g., State v. Johnson*, 105 Or App 587, 805 P2d 747 (1991).

Of course, none of those factors is in itself determinative, because courts must consider the totality of the circumstances. In each of those cases, the court acknowledged that there is a "continuum of intrusiveness," *State v. Gerrish*, 311 Or 506, 510, 815 P2d 1244 (1991), and, at some point along that continuum, the officer's behavior stepped over the line of what is "significantly * * * accepted in ordinary social intercourse," *Holmes*, 311 Or at 410. For instance, in

*Johnson,* what started out as mere conversation was converted into a stop—that is, a constitutionally significant restraint on the defendant's liberty—when police requested that the defendant alter his course of travel to facilitate continued questioning after an initial inquiry did not furnish reasonable suspicion. 105 Or App at 590-91; *see also State v. Evans,* 16 Or App 189, 196-97, 517 P2d 1225 (1974) (holding that police seized defendant by a show of authority when they continued to question him regarding the contents of his pocket after their initial inquiry did not provide reasonable suspicion of criminal activity). In *Puffenbarger,* police officers, after speaking with the defendant and learning that he did not wish to speak with them, continued to follow the defendant for several blocks while calling out questions and driving on the wrong side of the street. 166 Or App at 434-35.

The common theme of those cases is that a reasonable person would not have felt free to leave after a law enforcement officer approached the person to seek information about his identity and past or present criminal conduct and continued to treat him as an investigatory subject even after being given satisfactory answers to the officer's initial noninvasive inquiries. *See also Hall,* 339 Or at 19 (explaining that the defendant was seized when the police took the defendant's identification and radioed police dispatch for a warrants check); *Atkin,* 190 Or App at 391 (holding that a "stop" occurred when an officer approached the defendant, asked for her identification, ran a warrants check, and questioned the defendant about whether she possessed any drugs or weapons while waiting for the results of the warrants check).

In contrast to the foregoing cases, the record before us is devoid of any evidence that Fugate intended to rely or actually relied on his authority as a member of the fire department to convince defendant to stay. Defendant approached Fugate as a friend—neither Fugate nor any other firefighter approached him for any reason other than to offer medical assistance—and nothing in the record suggests that Fugate's manner in interacting with defendant went beyond what one would normally expect between a citizen and a firefighter at an accident scene. In fact, defendant described Fugate as "standoffish"; he did not describe Fugate as assertive, or overbearing, or intimidating, or coercive, or

exhibiting any other characteristic that might suggest that Fugate was attempting to show authority over defendant. *See Holmes*, 311 Or at 411 (holding that an officer's order for a vehicle to stop was not a constitutionally significant restraint on the driver's liberty because "[n]o psychologically intimidating environment had been created"). The evidence does not support the contention that Fugate intentionally and significantly restrained defendant's liberty, as required by *Holmes*, and we therefore conclude that his statement to defendant did not turn the encounter at the accident scene into a seizure.

Moreover, defendant cannot identify any show of authority by Fugate beyond what might be expected by an ordinary private citizen other than the fire department's "apparent authority backed up by official uniforms and flashing lights on their apparatus." But the fact that there were lights flashing at the scene cannot, by itself, convert Fugate's statements into a constitutionally significant restraint on defendant's liberty. *See, e.g., Holmes*, 311 Or at 411 (declining to hold that a police officer's flagging down of a vehicle to direct a driver around the scene of an accident, which was " 'lit up like a Christmas tree,' " was a constitutionally significant seizure); *State v. Blair/Vanis*, 171 Or App 162, 172-73, 14 P3d 660 (2000), *rev den*, 332 Or 137 (2001) (citing *State v. Dubois*, 75 Or App 394, 398, 706 P2d 558, *rev den*, 300 Or 451 (1985) (noting that the use of overhead lights for safety reasons does not necessarily transform an encounter into a stop because "[a] more *significant* restraint is required" (emphasis added)). Nor is there evidence in the record from which we can discern what type of uniform Fugate was wearing[3] but the fact that Fugate was in an "official uniform" is not dispositive. It is common knowledge that police are charged with enforcing criminal laws and firefighters and EMTs are not,

---

[3] Defendant testified only that Fugate was a member of the "fire department"; he did not describe the uniform Fugate was wearing at the time defendant asked him for a ride home or what role Fugate was playing at the scene. Tilson testified that EMTs are part of the fire department, and that "EMT's usually wear a blue jump suit and the fighters and—would normally wear their Nomax turnouts." It is not apparent from the record of the suppression hearing which of those uniforms Fugate was wearing because we cannot discern whether he was acting as a firefighter or as an EMT.

even though they respond to emergency situations in official uniforms.

Defendant's own testimony bolsters our conclusion that he was not significantly restricted by Fugate. Defendant testified that, after first being told by Fugate to wait for the officer's arrival, he began walking up the road. That testimony certainly indicates that defendant did not believe he was being detained by Fugate when initially told to remain at the scene, despite the fact that Fugate was wearing some type of uniform and lights were flashing. Further, defendant did not testify that, when he started to walk up the road, Fugate impeded or attempted to impede his progress in any way other than to tell defendant he should remain because an officer was coming.

We next consider whether defendant believed that he had been detained, and, if so, whether that belief was objectively reasonable under the circumstances. As discussed, there is nothing to demonstrate that defendant believed that he was being detained when initially told by Fugate that Fugate could not give him a ride home because defendant testified that he began to leave even after being told to stay. Thus, our inquiry into the second prong of the *Holmes* test is limited to (1) whether defendant believed that he had been seized after he began walking up the road and Fugate reiterated that he had to wait for the officer, and, if so, (2) whether that belief was objectively reasonable.

Defendant testified that he followed Fugate's instructions because the firefighters were his friends and because he "was taught to respect authority figures." Those stated reasons do not show that defendant believed that he had been seized. Even assuming that he believed that he had been seized after being told a second time to wait for an officer,[4] that belief was not objectively reasonable. Defendant did not contend that Fugate displayed any additional authority when he made the second request. Thus, it appears that defendant simply changed his mind about leaving the scene

---

[4] It is not entirely clear what Fugate told defendant after he started walking up the road. On cross-examination, defendant testified that Fugate said, "You can't walk up the road." On redirect examination, defendant testified, "Woody said one more time, hey, you've got to wait here, there's an officer coming."

after the second request because of his own character traits. *See State ex rel Juv. Dept. v. Deford*, 177 Or App 555, 564-65, 34 P3d 673 (2001) (defendant's personal, internal pressure cannot be attributed to the state). No reasonable person would believe that a friend had the power to restrict his or her freedom of movement on a public thoroughfare, and there is such a wide array of "authority figures" that have no authority or ability to seize a person (for example, one's work supervisor) that an objectively reasonable person would not believe that he or she could be restrained by such a person. Although a reasonable person would no doubt think certain authority figures—such as law enforcement officers—have that authority, the context of the exchange between Fugate and defendant does not suggest that Fugate was such a figure in defendant's eyes. And, as we explained above, even if Fugate was wearing an official firefighter's uniform (although the record does not establish that fact) and there were flashing lights from several emergency vehicles, such would not lead a reasonable person to conclude that he was being detained. Firefighters, EMTs, and emergency vehicles routinely appear at accidents—as do police officers—but citizens do not associate seizure of a person with firefighters and EMTs. That is a police function.[5]

The record does not support a finding that Fugate's instruction for defendant to stay at the accident scene until an officer arrived was a show of authority sufficient to implicate the protections of Article I, section 9. Further, we cannot find on this record that defendant believed that he was being detained, and, even if defendant believed that he had been detained, that belief was not objectively reasonable under the circumstances. Accordingly, the trial court correctly denied defendant's motion to suppress.

Affirmed.

---

[5] The definition of a peace officer does not include firefighters or EMTs, ORS 133.005, and the list of official persons authorized to make an arrest includes peace officers, parole and probation officers, and federal officers, but not firefighters or EMTs. ORS 133.220.