Argued and submitted October 31, 2011, affirmed August 29, petition for review denied December 27, 2012 (353 Or 127)

## STATE OF OREGON,
*Plaintiff-Respondent,*

v.

## ALEX SOTO,
*Defendant-Appellant.*

Multnomah County Circuit Court
100343090; A145603

284 P3d 1254

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Karla H. Ferrall, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

ARMSTRONG, P. J.

Duncan, J., dissenting.

## ARMSTRONG, P. J.

Defendant appeals a judgment of conviction for unlawful possession of a firearm, ORS 166.250, arguing that the trial court erred in denying his motion to suppress evidence obtained as a result of an unlawful seizure and the subsequent search of defendant's pants pocket. We disagree with defendant's premise that he was unlawfully seized, and, accordingly, we affirm.

We review a court's denial of a motion to suppress for legal error and defer to the court's findings of historical fact if there is evidence to support them. *State v. Mitchele*, 240 Or App 86, 88, 251 P3d 760 (2010). So far as the court did not make express findings, we resolve any factual disputes in a way that is consistent with the court's ultimate conclusion. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005).

Consistently with that standard, we take the following facts from the court's ruling and the record of the suppression hearing. While on gang interdiction duty on an afternoon,[1] Portland Police Officer Taylor and his partner were patrolling an area in Northeastern Portland that is subject to gang activity. The officers noticed a group of three men, including defendant, passing in front of their marked patrol car as the officers were stopped at an intersection. Because Taylor recognized one of the men other than defendant from a previous encounter—during which the man had talked openly about being a member of a gang— and noticed that all of the men wore clothing that, to Taylor, suggested gang affiliation, he decided that he wanted to talk to them. Taylor turned the car and drove it in the direction that the men were heading, parked behind the group, and— without turning on the car's lights, using its siren, or yelling at the men—got out of the car and started walking with his partner to catch up to the group.

As the officers were following the men, Taylor said, "Hi, guys," and two of them stopped and began talking with Taylor's partner; however, defendant continued walking.

---

[1] In the course of gang interdiction duty, police officers are responsible for taking certain actions, including talking to people affiliated with gangs, to establish a police presence in a neighborhood for the purpose of trying to prevent gang-related activity there.

Taylor briskly followed behind defendant and said to him, "Hey there." Defendant did not respond but, rather, continued walking until Taylor caught up to him and said, "We were hoping to talk [to] you guys. Is that okay?" At that point—about 30 feet away from where Taylor's partner was talking with the other men—defendant stopped walking, turned toward Taylor, nodded his head, and said, "Yeah." Taylor then asked, "Would it be okay if we walked back to where your friends are?" Defendant replied, "Okay."

Defendant and Taylor began to backtrack, and, just before they reached the group—but after defendant had told Taylor his name—Taylor asked defendant, "Do you have any weapons on you?" Defendant nodded,[2] and, after Taylor asked him whether he was answering his question affirmatively, defendant said, "Yeah." Taylor testified that, up to that point in the encounter, he had maintained a conversational tone with defendant and was being neither directive nor demanding. He also testified that his question about the weapon was merely him being "nosey" in the hopes that he would "get an opportunity to search and find a weapon."

Taylor then instructed defendant to put his hands behind his head and asked him where the weapon was located. Defendant shook his right leg and looked down at it, and Taylor felt the outside of defendant's right pants pocket. He immediately felt a handgun and pulled it out of the pocket. As a result of the encounter, the state charged defendant with one count of unlawful possession of a firearm.

Before defendant's case was tried to the court, he moved to suppress, under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution, the evidence obtained after Taylor's search—*viz.*, the gun and statements that defendant had made after discovery of the gun and his receipt of *Miranda* warnings. After a hearing at which Taylor testified, the court denied defendant's motion, concluding that the encounter was "mere conversation all the way up to where [Taylor]

---

[2] According to Taylor, defendant was free to end the interaction and leave until he indicated that he had a weapon.

asked him [if] he ha[d] a weapon" and, once defendant admitted that he did have a weapon, Taylor's subsequent search of his pants pocket was justified by reasonable suspicion that defendant unlawfully possessed a firearm.

The determinative inquiry in this case is at what point during defendant's encounter with Taylor was defendant seized under Article I, section 9.[3] On the one hand, defendant contends that he was seized at various points during the encounter: when Taylor followed him; attempted to get his attention; asked him to walk 30 feet in the opposite direction; and asked him for his name and whether he was carrying a weapon. On the other hand, the state predictably responds that Taylor's actions during the parts of the encounter on which defendant relies were insufficient to effect a seizure under the test articulated in *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010). As explained below, the state has the better of the argument.

A limitless variety of encounters may occur between citizens and police officers, but, for purposes of Article I, section 9, those encounters are shoehorned into one of two well-established, and oft-repeated, categories: (1) a mere conversation, an officer's casual encounter that has no constitutional import and, hence, for which the officer need not have any justification, or (2) a seizure, an encounter characterized by an officer's restraint of a person for investigative purposes and for which the officer needs some type of justification, depending on the type of seizure, so as not to offend Article I, section 9. *Id.* at 308-09.

To differentiate between mere conversation and a seizure, the Supreme Court has instructed courts to undertake the following fact-specific evaluation of the totality of the circumstances in a case:

> "A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under

---

[3] As explained below, 252 Or App at 59 n 6, the answer to that inquiry also resolves defendant's federal constitutional argument.

the totality of the circumstances *would* believe that (a) above has occurred."

*Id.* at 316 (emphasis in original). Under that test, the touchstone for determining whether a seizure has occurred is whether an officer has restricted the defendant's liberty or freedom of movement by a show of authority. *State v. Rodgers/Kirkeby*, 347 Or 610, 621-22, 227 P3d 695 (2010). Such a restriction may be accomplished through purely verbal means, as shown, for example, by the content of an officer's questions to the defendant, *Ashbaugh*, 349 Or at 317; however, an officer does not seize a person merely by asking the person questions that most people would not ordinarily ask another person, *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991). In addition to the words used by an officer, the officer's conduct during the encounter may manifest the necessary show of authority that gives rise to a seizure, especially if the officer physically restrains the defendant or acts in a threatening or coercive manner toward the defendant. *Ashbaugh*, 349 Or at 317; *Rodgers/Kirkeby*, 347 Or at 622. Moreover, if the defendant would know, in light of an officer's actions, that he or she is the subject of a criminal investigation, then a reasonable person in the defendant's position would believe that his or her freedom of movement had been significantly restricted. *State v. Radtke*, 242 Or App 234, 238-39, 241, 255 P3d 543 (2011).

Even though the fact-intensive nature of the seizure inquiry does not lend itself to generalization, the Supreme Court has articulated certain precepts that courts should keep in mind when evaluating whether an encounter, such as the one in this case, between officers and pedestrians— that is, not the more typical officer-motorist encounter—are seizures under Article I, section 9. In that regard, the court has explained that

"officers remain free to approach persons on the street or in public places, seek their cooperation or assistance, request or impart information, or question them without being called upon to articulate a certain level of suspicion in justification if a particular encounter proves fruitful. A street or public place encounter does not amount to an Article I, section 9[,] 'seizure' merely because the encounter

may involve inconvenience or annoyance for the citizen and the other party to the encounter is known to be a law enforcement officer. Even physical contact does not transform the encounter into a 'seizure' if it is a normal means of attracting a person's attention (*e.g.* [,] policeman tapping citizen on the shoulder at the outset to get a citizen's attention). \* \* \* Rather, the encounter is a 'seizure' of a person only if the officer engages in conduct *significantly beyond* that accepted in ordinary social intercourse. The pivotal factor is whether the officer \* \* \* has \* \* \* conducted himself [or herself] in a manner that would be perceived as a nonoffensive contact if it had occurred between two ordinary citizens."

*Holmes*, 311 Or at 410 (citation omitted; emphasis added). With that rubric in mind, we turn to the pertinent circumstances of defendant's encounter with Taylor in search of the requisite show of authority.

We begin at the outset of the encounter, at which time Taylor parked his patrol car behind defendant and the other men in the group and got out of the vehicle. By parking where he did in relation to the group, Taylor avoided creating the impression that the officers were impeding the group's ability to continue walking in the direction in which they were originally headed without interacting with the officers. *See, e.g.*, *Ashbaugh*, 349 Or at 317 (explaining that, if the officers were to position themselves in a way that suggests that they have surrounded a defendant, that conduct could be a show of authority); *State v. Wood*, 188 Or App 89, 94, 69 P3d 1263 (2003) (concluding that the defendant was seized under Article I, section 9, in an officer-driver encounter when, among other circumstances, the uniformed officer "to whom [the] defendant had related his plan to leave the car [that the defendant was driving], stood so as to make that exit impossible and then asked [the] defendant a question"). Moreover, Taylor did not use the patrol car's overhead lights or its siren to get the group's attention, but rather, he chose a less intrusive and confrontational means, calling out to the men after the officers had gotten out of their car. Therefore, none of the initial circumstances of the encounter establishes any show of authority.

Next, without reacting to Taylor's two attempts to get his attention in some manner that would show that he had heard Taylor's calls—for example, by turning toward or looking back at Taylor—defendant continued to walk down the street with Taylor in tow. Taylor finally caught up to defendant, got his attention, and asked him only once if he would be willing to talk to the officers. On appeal, defendant contends that his lack of response and act of continuing to walk away from Taylor clearly demonstrated that he had no interest in talking with the officers and that Taylor's persistent questioning despite defendant's purportedly manifest lack of interest would lead a reasonable person in defendant's position to conclude that he or she was not free to continue walking away without answering Taylor's questions.

That contention falters for at least two reasons. First, defendant had not "clearly" demonstrated that he did not want to talk to Taylor by continuing to walk away. Taylor's final question to defendant—"We were hoping to talk [to] you guys. Is that okay?"—was the first definite indication that Taylor wanted to talk with defendant—rather than get his attention for some other reason—and defendant stopped after Taylor asked the question and immediately agreed to talk—rather than continuing to walk away, which, in light of Taylor's specific question, would have been a reaction consistent with the inference advanced by defendant that he did not want to talk with Taylor. Therefore, contrary to defendant's argument, Taylor was not trying to overcome defendant's clear exercise of his freedom of movement. Moreover, although Taylor's persistence in trying to get defendant's attention, which lasted the short time that it took to walk roughly 30 feet, may have inconvenienced or annoyed him, Taylor did not act beyond—much less *substantially* beyond, as *Holmes* requires—what a reasonable person in defendant's position would expect in normal social intercourse. Accordingly, a reasonable person at that point in the encounter would not believe that his or her freedom of movement had been restricted by a show of authority.[4]

---

[4] There may very well be a point at which an officer's persistent questioning of a pedestrian who is walking away from the officer could effectuate a seizure under Article I, section 9, but this is not that case.

Next, at Taylor's request, to which defendant readily agreed, defendant and Taylor changed directions and began to return to where the two other members of the group had stopped—about 30 feet away. On appeal, defendant seizes on that circumstance and, relying on *State v. Johnson*, 105 Or App 587, 805 P2d 747 (1991), contends that the change in direction initiated by Taylor was a show of authority. However, *Johnson* does not bear the weight that defendant has sought to place on it.

In *Johnson*, three uniformed police officers were investigating a report of a fight in an apartment building's parking lot. The officers saw the defendant walking near the parking lot, and one of the officers, Tercek, asked the defendant if he would talk with him. The defendant stopped behind a bush and responded affirmatively. Tercek told the defendant about the nature of the investigation and asked the defendant whether he knew anything about any fighting in the parking lot. The defendant replied, "No." Despite that response, Tercek told the defendant that he could not see him very well and eventually said, "I can't see you back there, can you step out [from behind the bush]?" *Id.* at 589 (brackets in *Johnson*). In response, the defendant changed course and walked roughly 15 feet toward the officer.

The issue on appeal in *Johnson* was whether the defendant was seized at some point during the encounter with Tercek. We concluded that the encounter began as a mere conversation when Tercek approached the defendant and posed the noninvasive question about whether the defendant knew anything about a fight. *Id.* at 590-91. But the encounter transformed into a seizure after the defendant had responded that he did not know anything about what the officers were investigating, because Tercek persisted in requesting that the defendant alter his direction and walk 15 feet toward him so that Tercek could continue to question him. *Id.* Put differently, Tercek's persistence in the face of the defendant's denial of wrongdoing demonstrated that the defendant was the subject of a continuing investigation about the reported fight, and "a reasonable person in [the] defendant's position would conclude that he [or she] was being summoned by the officers and was not free to continue walking back to the apartment." *Id.* at 590; *see also State v.*

*Scatchard*, 208 Or App 315, 320-21, 145 P3d 237, *rev den*, 342 Or 254 (2006) ("For instance, in *Johnson*, what started out as mere conversation was converted into a stop *** when police requested that the defendant alter his course of travel to facilitate continued questioning after an initial inquiry did not furnish reasonable suspicion.").

Here, unlike in *Johnson*, the encounter between defendant and Taylor did not transform from a mere conversation to a seizure. Rather, at the point at which defendant and Taylor had changed direction at Taylor's request, Taylor had merely asked defendant if he would be willing to talk, without explaining why Taylor wanted to do so. Therefore, without any indication about the subject of the conversation, a reasonable person in defendant's position would not have thought that Taylor had restricted his or her freedom of movement by indicating that he or she was the subject of a criminal investigation.

Finally, Taylor asked defendant what his name was and whether he was carrying a weapon. As to the former question, unlike cases in which we have concluded that an officer's request for identification would lead a reasonable person to think that he or she was the subject of a criminal investigation and thus not free to leave,[5] Taylor did not write down defendant's name, ask for some tangible form of identification, or otherwise indicate that he was going to run a warrants check on defendant. Rather, the purpose of Taylor's question was merely to figure out to whom he was talking—something a reasonable person engaged in a conversation with a stranger would expect the stranger to ask—and not to initiate a criminal investigation of defendant. As to the question about the weapon, the content of the question, asked in a conversational tone and unaccompanied by some outward show of authority,

---

[5] *E.g., Radtke*, 242 Or App at 241 ("We conclude that a reasonable person in [the] defendant's position would have believed that an investigation began when [the officer] took note of her name and date of birth; thus, *** she was under the impression that the police had begun an investigation of her and *had not given her any reason to believe that it had ended.* *** [T]hose facts add up to a seizure." (Emphasis added.)); *State v. Parker*, 242 Or App 387, 394, 255 P3d 624 (2011) (concluding that reasonable person would believe that he or she was not free to leave when the officer "wrote down [the] defendant's name and date of birth and *** then immediately returned to his vehicle and ran a [warrant] check").

plainly did not effectuate a seizure. *See Ashbaugh*, 349 Or at 317 (concluding that the officer's question whether the defendant had anything illegal in her purse did not in itself cause her to be seized); *State v. Jones*, 241 Or App 597, 604, 250 P3d 452 (2011) (same).

In conclusion, none of the individual circumstances of defendant's encounter with Taylor support defendant's contention that Taylor restricted defendant's freedom of movement by a show of authority. Further, we conclude that all of Taylor's actions, considered as a whole, were tailored to be minimally intrusive and did not constitute a show of authority that would lead a reasonable person to believe that his or her freedom of movement had been restricted.[6]

Accordingly, defendant had not been seized until after Taylor had reasonable suspicion to believe that defendant unlawfully possessed a firearm, and, therefore, the court did not err in denying defendant's motion to suppress.

Affirmed.

**DUNCAN, J.,** dissenting.

The dispositive issue in this case is whether Officer Taylor stopped defendant. Based on the totality of the circumstances of Taylor's pursuit and questioning of defendant, I would conclude that Taylor stopped defendant no later than when he asked if defendant had any weapons. Because the stop was not justified by reasonable suspicion, it violated Article I, section 9, of the Oregon Constitution,[1] and the trial court erred in denying defendant's motion to suppress evidence that resulted from it. Therefore, I respectfully dissent.

---

[6] On appeal, defendant advances a cursory argument under the federal constitution in which he asserts, in essence, that the analytical framework for determining whether a seizure has occurred under the Fourth Amendment in this case is coextensive with the same framework under Article I, section 9. In light of that argument, we reject defendant's federal constitutional argument for the same reasons that we reject his state constitutional argument.

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

Article I, section 9, protects individuals against unreasonable searches and seizures. For the purposes of Article I, section 9, a "seizure" occurs "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances would believe that (a) above has occurred." *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010) (emphasis omitted). A "stop" is a type of seizure; it is a temporary restraint on a person's liberty, and it must be justified by reasonable suspicion. *Id.* at 308-09.

An officer may stop an individual through the use of physical force or through a show of authority. *Id.* at 309; *State v. Warner*, 284 Or 147, 161-62, 585 P2d 681 (1978); *State v. Evans*, 16 Or App 189, 197, 517 P2d 1225, *rev den* (1974) ("[T]he constraint of volition is equally real whether it arises by implication from the color of authority of the police or from their express command."). In this case, defendant contends that Taylor stopped him through a show of authority.

An officer's conduct may constitute a stop through a show of authority if the officer "summon[s the individual] away from a task" or requires the individual "to alter his course of conduct." *State v. Crandall*, 197 Or App 591, 595, 108 P3d 16 (2005), *rev'd on other grounds*, 340 Or 645, 136 P3d 30 (2006). *State v. Johnson*, 105 Or App 587, 589-91, 805 P2d 747 (1991), is illustrative. In *Johnson*, three uniformed police officers responded to a report of a fight in an apartment building parking lot. They saw the defendant leave an apartment with a flashlight in his hand, walk to the edge of the parking lot, and turn and walk back toward the apartment. One of the officers called out to the defendant, who was 15 feet away and on a path bordered by a chest-high bush, and asked if the defendant would talk with him. The defendant replied, "Sure." The officer told the defendant that he was investigating a report of a fight, and he asked if the defendant knew anything about the fight. The defendant said that he did not. The officer asked the defendant, who had his hand in his pocket, what was in his pocket. The defendant said, "Nothing," and showed both of his hands to the officer. The officer said, "I can't see you back

there, can you step out [from behind the bush]?" (Brackets in original.) The defendant changed his course and walked the 15 feet to where the officers were standing.

We held that the officer's conduct constituted a stop, explaining that, "[u]nder the circumstances, a reasonable person in [the] defendant's position would conclude that he was being summoned by the officers and was not free to continue walking back to the apartment." 105 Or App at 590. The officer's request that the defendant change his course and approach the officers constituted a show of authority, which, we concluded, "converted the conversation into a stop." *Id.* at 591.

Similarly, we have held that an officer's conduct constitutes a stop if it would cause an individual to believe that he or she is not free to ignore the officer and go about his or her business. *State v. Penney*, 87 Or App 357, 360-61, 742 P2d 660 (1987) (discussed below); *State v. Brown*, 31 Or App 501, 506, 570 P2d 1001 (1977) (whether an officer has stopped an individual depends on whether the individual would believe that he or she "could refuse to cooperate and walk away"). Thus, if an officer causes an individual to believe that he or she has no choice but to talk with the officer, the officer has stopped the individual. *Penney*, 87 Or App at 360-61. In addition, if an officer causes an individual to believe that he or she is the subject of an ongoing investigation that could result in his or her immediate citation or arrest, the officer has stopped the individual. *See, e.g.*, *State v. Hall*, 339 Or 7, 19, 115 P3d 908 (2005) (officer's act of running a warrant check on the defendant constituted a stop).

In *Penney*, an officer saw the defendant walking away from a pedestrian mall. When the defendant noticed the officer's patrol car, he turned around and headed back toward the mall. The officer drove after the defendant and "[a] short game of cat and mouse ensued." 87 Or App at 359. The defendant ran away from the officer, and the officer followed in the patrol car, driving the wrong way down a one-way street and through the mall. The officer pulled over 10 feet behind the defendant and got out of the patrol car. The defendant stopped, turned around, and approached the officer.

We held that the officer's pursuit was a show of authority that constituted a stop. *Id.* at 360-61. We explained:

"[T]he defendant was stopped when [the officer] pulled up and got out of his patrol car ten feet behind him. That represented the culmination of a police pursuit by a police officer in a patrol car of a pedestrian through and around a pedestrian mall. *It is highly unlikely that, at that precise point, a reasonable person would have felt free to walk away.* [The] [d]efendant had already demonstrated that he had no desire to engage the police in conversation when he changed directions on first sighting [the officer's] patrol car and attempted to elude the police."

*Id.* (emphasis added). Based on the officer's pursuit, we concluded, "[I]t is clear that [the] defendant had no reason to assume that he was free to leave after the officer caught up with him." *Id.* at 361.

Whether an encounter between an officer and an individual constitutes a stop for Article I, section 9, purposes is necessarily a "fact-specific inquiry into the totality of the circumstances of the particular case." *State v. Ehly,* 317 Or 66, 78, 854 P2d 421 (1993). In this case, Taylor and his partner, Ruppel, were on patrol when they saw defendant and two other young men walking eastbound on a sidewalk at 5:30 p.m. Taylor and Ruppel were in a marked patrol car. Taylor was driving; he was headed north but was stopped at an intersection. Defendant and his companions crossed the intersection in front of the patrol car. The officers, who were on gang interdiction duty, decided to contact them. Taylor turned the patrol car east at the intersection and pulled over behind defendant and his companions. Both officers, who were in uniform and carrying guns, got out of the car. Taylor called out "Hi, guys." Defendant's companions stopped, but defendant did not. He continued walking, leaving his companions behind. Ruppel stayed with defendant's companions, but Taylor followed defendant. He called out "Hey there," in an effort to get defendant to stop and talk. Defendant ignored Taylor and kept walking. Taylor walked briskly to catch up to defendant. When Taylor came alongside defendant, defendant looked over at him, but kept walking. Taylor said, "We were hoping to talk to you. Is that

okay? We were hoping to talk to you, okay?" At that point, defendant stopped, nodded, and said "Yeah." Taylor said, "Would it be okay if we walked back to where your friends are?" Defendant said, "Okay," and he and Taylor turned to walk back to where defendant's companions and Ruppel had stopped, about 30 feet away. As they did, Taylor asked defendant his name, which defendant provided. Taylor then asked, "Do you have any weapons on you?"

Taylor testified that he did not have any legal basis to stop defendant and his companions. He did not have reasonable suspicion that they were engaged in criminal activity, and he did not have probable cause to believe that they had committed any violations. Taylor also testified that he did not have any reasonable suspicion that defendant posed a threat, much less an "immediate threat of serious physical injury" that would have justified officer safety measures. *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). Defendant had not made any threats, was not carrying any weapons in plain view, and had not made any furtive movements. By his own description, Taylor asked if defendant had any weapons to be "nosey." He explained that he "asked about weapons hoping that [he would] get an opportunity to search and find a weapon."

If defendant had not stopped when he did, Taylor would have continued to try to get him to stop. Taylor testified that, if defendant had not stopped, he would have tried to either talk to him more or ask him more questions. But, he testified, he would have given up "at some point."

Under the totality of the circumstances in this case, Taylor stopped defendant. He pursued defendant, despite defendant's efforts to avoid interaction; he asked defendant to change his course of conduct in order to talk in the presence of a second officer; and he questioned defendant about criminal activity. As a result of Taylor's conduct, defendant was stopped no later than the point at which Taylor asked him if he had any weapons.

First, Taylor pursued defendant, even though, as in *Penney*, defendant demonstrated that he had no desire to speak with him. As described above, defendant did not stop when Taylor first called after him and his companions.

Defendant's companions stopped, but defendant did not; he ignored Taylor and kept walking, alone. When Taylor called out the second time, defendant still kept walking. And, when Taylor caught up to defendant, defendant looked over at him but still kept walking. By ignoring Taylor and walking away from him, defendant demonstrated that he did not want to talk with Taylor. As in *Penney*, Taylor's pursuit in response demonstrated that defendant was not "free to leave after the officer caught up with him." 87 Or App at 361. In other words, it demonstrated that defendant was not at liberty to "refuse to cooperate and walk away." *Brown*, 31 Or App at 506.

Second, after defendant stopped, Taylor asked him to change course and return to where his companions and Ruppel had stopped. Taylor's request is akin to the officer's request in *Johnson*, which was also in the form of a question. As in *Johnson*, Taylor asked defendant, without justification, to stop what he was doing, change his direction, and come over to where he could be questioned by police officers. "Under the circumstances, a reasonable person in defendant's position would conclude that he was being summoned by the officers and was not free to continue walking [in the direction he had been headed]." *Johnson*, 105 Or App at 590.

Third, after asking defendant to walk back to where Ruppel was, Taylor asked defendant his name and whether he had any weapons. As mentioned, Taylor did not observe any weapons in defendant's possession or have any reason to believe that defendant posed a threat. Taylor's question about whether defendant had any weapons would have indicated to defendant that he was the subject of a criminal investigation, specifically, an investigation into whether he was carrying a concealed weapon.

In sum, given the totality of the circumstances, a reasonable person in defendant's position would not believe that he or she was free to go on about his or her business, but rather would believe that he or she had been summoned by the police and could not continue to walk away because the police were investigating whether he or she was currently engaged in criminal activity. Thus, although it is true that an officer is free to approach individuals on the street and

question them, that is not all that happened here. Because of Taylor's pursuit and redirection of defendant and his question about particular criminal activity, this case is distinguishable from cases in which an officer simply approaches or calls out to a person and makes generic inquiries without any indication that, if the individual does not respond, his ability to simply go about his business will be impaired.

Because Taylor stopped defendant, in violation of Article I, section 9, the trial court should have granted defendant's motion to suppress. Therefore, I would reverse the trial court's judgment, and I respectfully dissent.